[Crim. No. 153.    Department One.—October 6, 1896.]

## THE PEOPLE, APPELLANT, v. JAMES H. CUMMINGS, RESPONDENT.

CRIMINAL LAW—OBTAINING PROPERTY BY FALSE PRETENSES—CONSTRUCTION OF CODE—LAND NOT INCLUDED IN OFFENSE.—An information of the crime of obtaining property by false pretenses, under section 532 of the Code, which describes the property charged to have been thus obtained as certain parcels of land, states no offense, under that section, which, in view of the history of the crime, and of the contemporary construction given to statutes of like purpose and effect in England and the United States, was not designed to include an instance of defrauding another of real estate, but was designed and aimed solely at protecting personal property, and in aid of the laws against larceny.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.    GEORGE H. BAHRS, Judge.

The facts are stated in the opinion of the court.

*W. F. Fitzgerald, Attorney General,* and *W. H. Anderson, Assistant Attorney General,* for Appellant.

*E. M. Morgan,* and *Severance & Sherman,* for Respondent.

VAN FLEET, J.—Defendant was accused by information of the crime of obtaining property by false pre-

tenses, under section 532 of the Penal Code—the property charged to have been obtained being described as two certain parcels of land. He demurred to the information as not stating an offense. The demurrer was sustained, and the people appeal, the sole question being whether land is such property as to be the subject of the offense sought to be charged.

We think the demurrer was properly sustained. Looking at the history of the offense, and the evil which it has always been designed to correct, and regarding as we must the contemporary construction given to statutes of like purpose and effect, both in England and the United States, we are satisfied that the provision of the code was not designed to include an instance of defrauding another of real estate, and, consequently, that the information did not charge an offense thereunder.

The language of the code defining the offense is: "Every person who knowingly and designedly by false or fraudulent representation or pretenses defrauds any other person of money or property, or who causes or procures others to report falsely of his wealth or mercantile character, and by thus imposing upon any person obtains credit, and thereby fraudulently gets into possession of money or property, is punishable in the same manner and to the same extent as for larceny of the money or property so obtained."

Similar provisions, varying slightly in verbiage, but having a common purpose, are to be found in the statutes of every state of the union, so far as our investigation extends, and like their English prototypes, the earliest of which is 30 George II, chapter 24, section 1, are the outgrowth and expansion of the old offense of "cheats" or "cheating" as it existed at the early common law proper, and later under the statute of 33 Henry VIII, sections 1, 2, "which," as suggested by Mr. Bishop, "is common law with us." These later statutes have been enacted, Mr. Bishop tells us, "to supply defects in the earlier law, which as trade increased was plainly seen not to go far enough in the

protection of fair dealing against knavery." (2 Bishop's
New Criminal Law, section 410.) [Cheating at common
law was a fraud perpetrated by means of a false symbol
or token, such as selling goods by false weights or meas-
ures, or other like act or thing of a character calculated
to deceive and defraud the public or the individual to
their pecuniary injury, and against which ordinary
prudence could not guard. The inadequacy of this
offense to meet the demands of advancing methods of
trade arose in part from the fact that it did not embrace
any act or thing accomplished without the aid of some
false token. Mere spoken lies or misrepresentations, or
verbal perversions of the truth of whatsoever nature,
employed to defraud, did not constitute the offense; and
it was in part to remedy this defect or omission that
the statutes creating the offense of false pretenses were
enacted, and which, by reason of their wider compre-
hension of the arts and methods of cheating, have
largely superseded the common-law offense.] (2 Bishop's
New Criminal Law, secs. 143–45; 1 Bishop's New Crim-
inal Law, sec. 571.)

In their origin both the common law and statutory
offenses were undoubtedly designed and aimed solely at
protecting personal property, and in aid of the laws
against larceny and theft. Indeed, they appear to have
sprung into being largely by reason of certain defects
in the application of the laws against larceny. Among
the reasons stated in the statute (33 Henry VIII) for
enlarging the offense of cheating are that "many light
and evil-disposed persons, not minding to get their liv-
ing by truth, etc., but compassing and devising daily
how they may unlawfully obtain and get into their
hands and possession goods, chattels, and jewels of other
persons for the maintenance of their unthrifty living;
and also knowing that if they came to any of the same
goods, chattels, and jewels by *stealth*, then they, being
thereof lawfully convicted, etc., shall die therefore—
have now of late falsely and deceitfully contrived, de-
vised, and imagined *privy tokens* and *counterfeit letters* in

other men's names, unto divers persons their special friends and acquaintances, for the obtaining of money, goods, chattels, and jewels of the same persons, their friends and acquaintances; by color whereof the said light and evil-disposed persons have deceitfully and unlawfully obtained and gotten great substance of money, goods, chattels, and jewels into their hands and possession, contrary to right and conscience," etc.; and in one of the early statutes relating to false pretenses it is recited that, whereas, "a failure of justice frequently arises from the subtle distinction between larceny and fraud," etc. — one of which distinctions being that when property was obtained by consent of the owner intending to part with the title, although by the grossest fraud, it would not constitute larceny. [And the offense of false pretenses under the English statutes has always been construed as largely analogous to and closely bordering upon that of larceny, and as applying only to personal property which was capable of manual delivery, and the subject of the latter offense; and has always been punishable in much the same manner as larceny. Real property under the English law was never the subject of the offense, either of cheating or of false pretenses. Being incapable of larcenous *asportation*, it was not regarded as requiring at the hands of the criminal law the same protection as personalty. Since it could not be carried away and dissipated like chattels, although a man might be deprived of his landed estate by means of fraudulent practices and devices, yet the property was bound to remain stationary and accessible to the reach of the law, and he was relegated to the civil courts for his redress of the wrong.]

Our American statutes upon the subject have all followed more or less closely those of England. As indicated, there are slight differences in language, but in substantive purpose and effect they are the same. Some, instead of employing the specific terminology of the English statutes in designating the character of the property made the subject of the offense, have used

more general and perhaps more comprehensive terms, such, for instance, as those found in the provision of our code above quoted. In their interpretation, however, of the purpose and effect of these statutes, the American courts, by reason no doubt of the origin of the offense, and in obedience to a well established rule of statutory construction, have closely followed in a general way that of the English courts, and the statutes of the various states, however general their terms, have been uniformly held to apply only to personal property of a larcenous nature. [In one case from Indiana (*State* v. *Snyder*, 66 Ind. 203), this rule seems to have been relaxed to the extent of holding that the fraudulent obtaining of board and lodging by false pretenses was within the statute. But in Wisconsin it was held that such an act was not within the law. (*State* v. *Black*, 75 Wis. 490.) The language of the Wisconsin statute was quite as general as our code provision, reading: "Any money, goods, wares, merchandise, *or other property*," and it was contended, as by the attorney-general it is urged here, that this language was sufficiently comprehensive to include any property. But it is there said: " The word ' property ' is in many cases construed to include ' things in action and evidences of debt.' (Rev. Stats., sec. 4972, subds. 3, 4.) But the words, ' other property,' in the statute quoted must, under the familiar rule *noscitur a sociis*, be limited to such identical classes of property as are therein previously enumerated; that is to say, ' money, goods, wares, merchandise, and other property ' *of that description*."]

The Indiana case above cited takes the widest departure from the original scope of the offense that has come under our observation. In no case, so far as an extended research discloses, has the offense ever been held to include transactions in land or real estate. In fact, but two instances are cited in which this claim has heretofore been made, and in both it was overruled. The first was in *State* v. *Burrows*, 11 Ired. 477, where it

is said: " There are three fatal objections to the indict-
ment.   1. Land is not included within the operation
of the statute.   It is true the words are very general:
' Money, goods, property, or *other things of value,*' ' or
any bank note, check, or order for the payment of
money, etc.'   But they must be construed with refer-
ence to the nature of the offense, the mischief intended
to be guarded against, and the particular terms used in
connection with the general terms.   Larceny at common
law was confined to 'goods and chattels.'   It did not
extend to land, because land could not be feloniously
taken and carried away, except insignificant parcels
thereof, and there was no mischief complained of in
that regard."   And, referring to the fact that the pun-
ishment for the offense was the same as that for larceny,
it is further said: "Thus we are furnished with a key
whereby to unlock the meaning of the statute.   It was
justly considered as great a mischief to be defrauded of
property by means of a forged or counterfeit paper, etc.,
as to be deprived of it by means of a felonious taking
and carrying away, and the object was to extend the
principle to cases where property was obtained in this
fraudulent manner. . . . . It may be that '*other things
of value*' was inserted to include corn, wheat, etc., grow-
ing and standing ungathered, but it would be a strained
construction to make it include *the very land,* for that is
not the subject of larceny at common law and as ex-
tended by the statute.   It would be to make the corol-
lary or sequent embrace a subject not embraced by the
original proposition, which is bad logic as well as bad
law."

The other instance arose in *Commonwealth* v. *Wood-
run,* 4 Pa. L. J., 362, where, discussing the sufficiency
of an indictment for cheating in a real estate transac-
tion, it is said: "There is another objection to this bill
of indictment, which to my mind is equally fatal.   The
subject matter of the charge laid in it is land and title
to it.   Does not the same reason apply against making
real estate the subject of a criminal charge for depriv-

ing its owner of it by cheating, as applies against mak-
ing land or any portion of it the subject of larceny?

"In both cases it is the mobility of the article obtained
which makes the transaction a public evil, as it enables
the offender to remove or conceal the property from its
owner, with himself, from public justice.   And it strikes
me as nugatory to prepare a penalty for obtaining prop-
erty which the offender cannot pass if obtained by fraud,
and which he cannot remove from its actual location.

"In all legislation against obtaining property by false
tokens or cheats the obtaining real estate thereby, I be-
lieve, has never been made the subject of criminal
charge and punishment."

Speaking of this offense, in Wharton's Criminal Law,
at section 1195, it is said: "As will be hereafter seen,
under the statutes, as first drafted, only larcenous prop-
erty is protected.   By the statutes now existing in most
jurisdictions this limit is obliterated, and the obtaining
by false pretenses both of land and of written securities
is made indictable."   But to the point that land is now
the subject of the offense, the single authority cited is
*State* v. *Burrows*, above cited and quoted from, which,
as will be noted, holds directly to the contrary.   Later
on, at section 1204, the same work again adverts to the
subject in this wise: "As we have seen, property not lar-
cenous was not at first covered by the statutes, and hence
the words 'money,' 'goods,' 'property,' have been held
not to include . . . . 'land.'"   Here, curiously enough,
to support this suggestion is again cited the same case
of *State* v. *Burrows, supra.*   It will be thus observed that
this case is cited as supporting directly opposite views
of the same question—an infirmity under which that
case can in no manner be said to rest, and the implied
suggestion of which was no doubt the result of mistake
or inadvertence on the part of the eminent writer or his
reviser.   In this immediate connection, however, it is
further said: "It is, otherwise, however, by special
statutes in most jurisdictions."   In view of what pre-
cedes it, this language is, we think, ambiguous and

liable to be misapprehended. If by it the writer intended thereby to reaffirm the idea previously suggested that the offense is now held to include land as one of its subjects, his authorities do not support him. The only cases cited to sustain the text are two: One the case of *State* v. *Snyder, supra,* which is simply to the effect that the statute included the fraudulent obtaining of board and lodging; and the other is that of *Regina* v. *Burton,* 54 L. T., N. S., 765, where it was held that one was properly convicted under the statutes for false representations made to obtain food. To this extent it may be our own statute would go. Its exact limitations in that respect are not involved, and need not be determined. But from a consideration of its language, and an examination and review of all the authorities that have come to our attention, either from the briefs or as a result of our own search, we are satisfied that it was not intended that the offense as there defined should take so wide a departure from its universally accepted scope, as theretofore limited and understood, as would be required to include the facts upon which this charge is laid.

As suggested in *State* v. *Burrows, supra,* the very language of our statute furnishes us a key to its intended limitation, in providing that the offense shall be *"punishable in the same manner and to the same extent as for larceny of the money or property so received."* Since real estate is not the subject of larceny, this language would be meaningless in attempting to apply it to the facts alleged in the information.

The judgment is affirmed.

GAROUTTE, J., and HARRISON, J., concurred.