# STATE v. BLAKE.

No. 2087. Decided November 29, 1909 (105 Pac. 910).

1. CONSPIRACY—CRIMINAL CONSPIRACY—DEFRAUDING OF REAL PROP-
ERTY. Under Comp. Laws 1907, section 4156, punishing two or
more persons who conspire to defraud another of any property
by means which are criminal, or which, if executed, would
amount to a cheat or to obtaining money or property by false
pretenses, conspiring together to cheat another of real property
by any means which, if executed, would amount to a cheat would
be a criminal conspiracy; that the conspiracy related to realty
being immaterial. (Page 611.)

2. CONSPIRACY—CRIMINAL CONSPIRACY—NATURE OF ACTS. To con-
stitute a criminal conspiracy, it is not necessary that the acts
agreed to be done would be criminal if done, if they would
amount to a civil wrong. (Page 611.)

3. CRIMINAL LAW—EVIDENCE—HEARSAY. In a prosecution for con-
spiracy whereby another was induced by false representations
to purchase worthless mining stock, a letter to the purchaser
from an officer of the mining company stating that the stock
was practically worthless, written in reply to a letter from the
purchaser inquiring as to the financial condition of the com-
pany, was inadmissible as hearsay; the alleged conspirators not
being connected therewith, or knowing thereof. (Page 612.)

4. CRIMINAL LAW — APPEAL — HARMLESS ERROR — ADMISSION OF EVI-
DENCE—PREJUDICIAL EFFECT. The admission of the letter was
prejudicial, there being no other evidence showing the value
of the stock or that the representations made were false. (Page
612.)

5. CRIMINAL LAW—CRIMINAL CONSPIRACY—ADMISSION OF EVIDENCE—
LETTERS. In a prosecution for criminal conspiracy for inducing
the purchase of worthless mining stock by false representations
contained in letters to the purchaser, stating that the stock was
valuable, and urging him to buy it for resale, such letters were
not admissible in evidence, where it was not shown that they
were written with the knowledge, or by procurement, of the
conspirators. (Page 612.)

6. CRIMINAL LAW—CRIMINAL RESPONSIBILITY—SUFFICIENCY OF EVI-
DENCE. In a prosecution for criminal conspiracy by inducing the
purchase of mining stock by false representations, contained in
letters written to the purchaser, evidence *held* not to show that
the letters were written with the knowledge or procurement of
the alleged conspirators. (Page 612.)

7. CONSPIRACY—CRIMINAL CONSPIRACY—PROSECUTIONS—PROOF. In a prosecution for criminal conspiracy by inducing the purchase of worthless mining stock by false representations as to its value, proof of the falsity of the representations was essential to a conviction. (Page 613.)

APPEAL from District Court, Fourth District; *Hon. J. E. Booth,* Judge.

Henry H. Blake was convicted of criminal conspiracy, and appealed.

REVERSED AND REMANDED.

*J. W. N. Whitecotton* and *J. A. Wilson* for appellant.

*A. R. Barnes,* Attorney-General, for the State.

STRAUP, C. J.

The defendant was charged with and convicted of criminal conspiracy. In the information it is alleged that the defendant and William A. Brittain conspired together to defraud and cheat E. A. Horn of real estate of the value of fifteen hundred dollars and to obtain it by false pretenses, by falsely and fraudulently representing to Horn that 6250 shares of the capital stock of the Galiher Mining & Milling Company were of the value of fifteen hundred dollars, thereby inducing and persuading Horn to convey the real property to Blake in exchange for the stock, which was worthless. To this information the defendant filed a general demurrer, which was overruled.

The evidence on the part of the state shows that on the 20th day of November, 1908, W. L. Johnston, at San Francisco, Cal., wrote to Horn at Independence, Utah, to the effect that Blake, who lived at Ft. Duchesne, Utah, had something like six thousand shares of stock of the Galiher Mining Company, whose property was located in the state of Washington, and that the property was good; that he tried to get Blake to place a price upon the stock, but that Blake had

failed to do so. Horn was thereupon requested to see Blake and purchase the stock from him for a price under fifty cents a share, and that Johnston would give Horn fifty cents a share for it, and that Horn could keep whatever profit was made in the transaction. Horn was urged to act promptly in the matter as Blake did not know the real value of the stock. He wrote him, "If you can possibly do so, see him at once. Do not give him time to find out anything about it; in other words, take him upon snap judgment." A few days after the receipt of this letter, Horn called on Blake, and said to him that he (Horn) had some mining stock that he would like to sell him. Blake replied that he was not buying any stock, and that he would rather sell the little that he had. In response to questions asked him by Horn, Blake said that he had stock of the Galiher Mining Company, that the company had twenty-one patented claims, a thirty ton mill, and everything paid for from ores taken out; that no dividends had been paid, and for that reason he could not afford to keep the stock and wanted to sell it, and that he would take thirty cents a share for it. He further told him that the ore ran very high in copper, and that the property was within six miles of a railroad. Horn told him that he did not have any money to put in mining stocks, but that he had some real estate near Theodore which he might trade for the stock. A day or two after that, Blake saw the real estate, and, through negotiations had between them, Horn conveyed the real estate to Blake in exchange for the 6250 shares of stock. On December 4th, Johnston wrote another letter to Horn in response to a letter which Horn had written to him, stating that he expected to leave for Portland to close a deal which would net him seven thousand dollars, but that he might not get the cash for thirty or sixty days, and expressed a hope that Horn had secured the stock, and if he was obliged to hold it he would pay him "interest on the same." On December 14th, Johnston again wrote Horn notifying him that he had purchased all the stock he was able to pay for at the rate of forty-seven cents per share, and that it was impossible for him to handle any more of

the stock just then, but that he would do so a little later on; that the stock was good and the price advancing, and if he had the means he would purchase all the stock at the price quoted in the former letters. Horn then wrote to the mining company at Cle Elum, Wash., inquiring about the financial condition of the company, and the value of the stock. On the 20th day of January the secretary of the company wrote Horn to the effect that the company was in bad shape financially, and that he was sorry that any one had misrepresented conditions in order to sell the stock; that the indebtedness of the company was in the neighborhood of $16,-000; that the capacity of the five-stamp mill was about fifteen tons daily; that when copper was worth twenty-four or twenty-five cents a pound some profit was made in the operation, but that no profit as to be made at the then price of copper with the mill situated as it was twenty-five miles from transportation; that there was very little money received by the company during the last two years, and that a few of them had been carrying things along in the hope that some turn might be made to get enough money to put the mine upon a paying basis; that those most intimate with the property had every faith in its becoming a large producer, but they were men of limited means and could not afford to longer put up any more money; that the assessment work, which amounted to $2600 a year, had been done up to date, but labor had only been partially paid for; that the company was owing other debts and obligations and that the property was then in the hands of a receiver; and that, under the circumstances, the stock had no value. He, however, expressed the usual optimistic miner's hope that some plan might yet be perfected whereby the indebtedness could be cleared up, a forced sale prevented, the rights of the stockholders preserved, and "the valuable property" of the company saved. All of these letters were admitted in evidence over the objections of the defendant.

Another witness, testifying on behalf of the state, testified that, prior to the writing of the letter from Johnston to Horn, the witness had sold to Brittain a typewriter which

the witness had owned and used about three years, and that there was a peculiarity in the type of the letter "h" (out of line), and that the letter "h" appearing in the letter written by Johnston to Horn had the same peculiarity. He, however, further testified that there were a great many Remington machines and that the same peculiarity might exist in other machines. Another witness testified that the paper upon which the letter from Johnston to Horn was written was "Colorado Bond" paper, handled and sold by Carter, Rice & Carpenter Paper Company of Denver, and that the witness had the exclusive sale of that paper at Vernal, Utah; but he did not know whether that kind of paper was in the market or was sold at San Francisco, or at Salt Lake City, or elsewhere. Still another witness testified that some time in November, 1908, Brittain said to him that he wanted to sell a ranch which Horn had owned, and which he had acquired on a loan made on the property, and that "he had got the best of the bargain in some way." The defendant testified that he had no knowledge of the letters written by Johnston to Horn, and did not know that such letters had been written, until he saw them at the preliminary examination. He admitted exchanging the stock for the real property, but denied the representations made by him as testified to by Horn. He further testified that he had no conversation and no transaction with Brittain in respect of the negotiations or the trade. Brittain testified in behalf of the defendant that he did not write the letters from Johnston to Horn, and that he had no knowledge of such letters until they were produced in court, and that the letters were not written on his typewriter, and that he had no conversation with Blake, and no transaction with him relating to the trade. W. L. Johnston also testified in behalf of the defendant that he had resided in California for a period of about twelve years, that he had never resided in Utah, that he did not know either Brittain or Blake, and that they were strangers to him; that in 1907 he had sold about 15,000 shares of stock of the Galiher Mining Company, and that when he

36 Utah—39

wrote the letter to Horn he had a deal in view to sell a block of such stock to a Mr. O'Brien for sixty cents a share; that he thereupon wrote to the company at Washington seeking information as to the names of the persons who were stockholders of the company, and was informed that some of the stock was held by persons residing in Utah, and that Blake had some of the stock; that he had written to Blake asking him to place a price upon the stock and that Blake did not do so; that through a Mr. Murphy he learned of Mr. Horn, who was acquainted with Blake, and thereupon he wrote Horn the letter hereinbefore referred to; that he dictated the letter to a stenographer at San Francisco and mailed and sent it from there to Horn, and that neither Blake nor Brittain had anything to do with writing the letter or any of the letters written by him to Horn. The foregoing is the substance of all the testimony in the case.

It is claimed by defendant that the court erred in overruling the demurrer. The statute (Comp. Laws 1907, sec. 4156), so far as applicable, defining criminal conspiracy, is as follows: "If two or more persons conspire . . . 4. To cheat and defraud any person of any property by any means which are in themselves criminal, or by any means which, if executed, would amount to a cheat, or to obtaining money or property by false pretenses," etc., they are punishable, etc. It is urged that no public offense is stated in the information, for the reason that real property, under the act in question, is no more subject to the offense, either of cheating or of obtaining property by false pretenses, than of larceny. Of course it is clear that real estate is incapable of larcenous asportation. And it had been held that an information which charged the crime of obtaining real property by false pretenses stated no public offense under a statute which rendered a person punishable who, by false or fraudulent representations, obtained from another "any money, goods, property, or other thing of value." (*People v. Cummings*, 114 Cal. 437, 46 Pac. 284.) It was there held that the same reasons applied against making real estate the subject of a criminal charge of depriving its owner of it

by cheating, as applies against making land the subject of larceny. From such holding it is argued that, since real estate cannot be made the subject of a criminal charge if obtaining it by false pretenses, it likewise is not criminal if two or more conspire to obtain it by such means. The express language of the statute defining criminal conspiracy makes it a crime not only to conspire to cheat and defraud any person of any property by means which are in themselves criminal, but also "by any means which, if executed, would amount to a cheat, or to obtaining money or property by false pretenses." If, now, the information sufficiently charged that the defendant and Brittain conspired together to cheat and defraud another of any property by any means which, if executed, would amount to a cheat, or of obtaining property by false pretenses, a public offense was stated. That the object of the conspiracy related to real property can make no difference. In the case of *People v. Richards,* 1 Mich. 216, 51 Am. Dec. 75, it was held that "the crime of conspiracy does not depend upon the kind of property which it was the object of the conspiracy to obtain; and an indictment for conspiracy to cheat an individual out of lands lies. . . . The intended fraud or cheat gives character to the transaction, and not the nature of the property." To the same effect is the case of *State v. Bradley,* 48 Conn. 535. We think the statute is also to that effect. The gist of it is a conspiracy to cheat and defraud a person of any property (1) by means which are in themselves criminal, (2) by means amounting to a cheat, (3) by means amounting to obtaining property by false pretenses. A conspiracy to cheat and defraud one of any property by any such means is denounced by the statute as a criminal conspiracy, regardless of the character of the property which was the object of the conspiracy. Nor was it essential that the means employed should in themselves be criminal. It is generally recognized that "it is not necessary, in order to constitute a conspiracy, that the acts agreed to be done should be acts which, if done, would be criminal. It is enough if the acts

agreed to be done although not criminal are wrongful; that is, amount to a civil wrong." (2 Bishop's Criminal Law [7th Ed.], sec. 178.) We think the demurrer was properly overruled.

Another assignment relates to the admission in evidence of the letters from Johnston to Horn, and the letter from the secretary of the mining company to Horn. The letter from the secretary was clearly hearsay and inadmissible. There is no evidence whatever to connect the defendant, or his co-conspirator, with the letter, or to show that it was written with their knowledge or by their procurement. Horn, at his own instance, and on his own written volition wrote to the company inquiring of the value of the stock and the condition of the company. The secretary of the company wrote him giving him the information. The admission in evidence of the letter was of course prejudicial. Without the contents of that letter there was no evidence tending to show the financial condition of the company or the character or value of its property, or the value of the stock, or that the representations made by Blake to Horn were false.

We are also of the opinion that the letters from Johnston to Horn were likewise inadmissible. It is not alleged, nor is it claimed, that Johnston was in any manner a party to the alleged conspiracy, or that he had any connection therewith. The claim made by the state is that these letters were not written by Johnston, but by either Blake or Brittain. We think the evidence was not sufficient to connect either of them with any of the letters, or to show that either of them wrote the letters, or that they were written with their knowledge, or at their instance, or by their procurement. The only testimony relied upon by the state in that regard is that the letter from Johnston to Horn was written on Colorado Bond typewriting paper; that Brittain had written letters on similar paper; that that kind of paper was sold in the market at Vernal; that the letter "h" contained in the typewritten letter had a peculiarity similar to the type of the letter "h"

on the Remington machine owned by Brittain. Though it may be said these circumstances were suspicious, yet the witnesses who testified to them also testified that there might be other Remington machines which had the same peculiarity, and that they did not know whether the same kind of paper was not also sold in the market at San Francisco, and other places. From what was shown the inference is not logical that such paper was only sold in the town of Vernal, or in that vicinity. While it was not essential to show Blake's or Brittain's authorship of the letters, or their connection therewith, or that they had induced or procured them to be written, by any direct evidence, yet it was essential to show some fact or circumstance which raised a logical inference as to the existence of the facts in issue and which were sought to be proved. The circumstances shown, though of a suspicious character, yet were not sufficient to raise such a logical inference, especially in the face of the positive and unimpeached testimony of Johnston that the letters were written by him wholly independently of either Blake or Brittain and not at the solicitation or request of either of them. Without the letters in evidence, especially the letter written by the secretary of the company to Horn, there is no evidence in the record tending to prove the essential allegations of the information with respect to the falsity of the representations of Blake as to the financial condition of the company or the character and value of its property, or the value of the stock.

For these reasons the judgment of the court below is reversed, and the cause remanded for a new trial.

FRICK and McCARTY, JJ., concur.