STATE of Wisconsin,
Plaintiff-Respondent-Cross-Appellant,

v.

ABBOTT LABORATORIES, AstraZeneca LP,
AstraZeneca Pharmaceuticals LP, Aventis
Behring, LLC f/k/a ZLB Behring, LLC, Aventis
Pharmaceuticals, Inc., Ben Venue Laboratories,
Inc., Boehringer Ingelheim Pharmaceuticals, Inc.,
Boehringer Ingelheim Roxane, Inc., Bristol-Myers
Squibb Co., Dey, Inc., Ivax Corporation, Ivax
Pharmaceuticals, Inc., Janssen LP f/k/a Janssen
Pharmaceutica Products, LP, Johnson & Johnson,
Inc., McNeil-PPC, Inc., Merck & Co. f/k/a
Schering-Plough Corporation, Merck Sharp &
Dohme Corp. f/k/a Merck & Company, Inc.,
Mylan Pharmaceuticals, Inc., Mylan, Inc.
f/k/a Mylan Laboratories, Inc., Novartis
Pharmaceuticals Corp., Ortho Biotech Products,
LP, Ortho-McNeil Pharmaceutical, Inc., Pfizer
Inc., Roxane Laboratories, Inc., Sandoz, Inc. f/k/a
Geneva Pharmaceuticals, Inc., Sicor, Inc. f/k/a
Gensia Sicor Pharmaceuticals, Inc., SmithKline
Beecham Corp. d/b/a GlaxoSmithKline, Inc.,
TAP Pharmaceutical Products, Inc., Teva
Pharmaceuticals USA, Inc., Warrick
Pharmaceuticals Corporation, Watson Pharma,
Inc. f/k/a Schein Pharmaceuticals, Inc. and
Watson Pharmaceuticals, Inc., Defendants,

510

Pharmacia Corporation,
Defendant-Appellant-Cross-Respondent.

Supreme Court

*No. 2010AP232–AC. Oral argument December 6, 2011.
—Decided June 22, 2012.*

2012 WI 62

(Also reported in 816 N.W.2d 145.)

515

516

For the defendant-appellant-cross-respondent, there were briefs filed by *O. Thomas Armstrong, Beth J. Kushner, Douglas M. Raines,* and *von Briesen & Roper S.C.,* Milwaukee, *John C. Dodds, Erica Smith-Klocek, Máire E. Donovan,* and *Morgan, Lewis, & Bockius, LLP,* Philadelphia, and *John Clayton Everett, Jr.* and *Morgan, Lewis, & Bockius, LLP,* Washington D.C., and oral argument by *John C. Dodds.*

For the plaintiff-respondent-cross-appellant, there were briefs filed by *Frank D. Remington,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general, and *George F. Galland, Jr., Charles Barnhill, Jr., Betty Eberle, Barry J. Blonien,* and *Miner, Barnhill & Galland, P.C.,* Madison, and oral argument by *George F. Galland.*

An amicus brief was filed by *Donald K. Schott, Elyce Wos, Matthew J. Splitek,* and *Quarles & Brady, LLP,* Madison; *William F. Cavanaugh, Adeel A. Mangi,* and *Patterson, Belknap, Webb & Tyler, LLP,* of counsel, New York; and *Andrew D. Schau* and *Covington & Burling, LLP,* of counsel, New York, for the Non-Pharmacia Brand Defendants.

An amicus brief was filed by *Robert H. Friebert, Shannon A. Allen,* and *Friebert, Finerty, & St. John, S.C.,* Milwaukee; and *Joseph Angland, Michael J. Gal-*

*lagher, Heather K. McDevitt,* and *White & Case, LLP,* New York, for the Non-Pharmacia Generic Defendants.

¶ 1. MICHAEL J. GABLEMAN, J. This case comes before us on certification from the court of appeals. The State brought a civil action against Pharmacia Corporation ("Pharmacia"), alleging that the company reported inflated drug prices to Wisconsin Medicaid. A jury found Pharmacia liable for violating Wisconsin Statutes sections 100.18(1) (1992)[1]—the Deceptive Trade Practices Act ("DTPA")—and 49.49(4m)(a)2. ("Medicaid fraud statute"). The jury awarded the State $2 million for the DTPA claim and $7 million for the Medicaid fraud claim, totaling $9 million in damages. Answering a special verdict question, the jury also determined that Pharmacia committed 1,440,000 separate violations of the Medicaid fraud statute. In post-trial proceedings, the circuit court vacated that answer and reduced the number of violations to 4,578. *See Reyes v. Greatway Ins. Co.,* 220 Wis. 2d 285, 301, 582 N.W.2d 480 (Ct. App. 1998) (holding that a circuit court may change a jury answer where it is not supported by credible evidence). Both parties appealed, raising numerous issues.[2] The court of appeals certified three to this court: 1) whether the State was entitled to a jury trial; 2) whether the

---

[1] The complaint alleged violations dating back to 1992. All subsequent references to any statutes or regulations, state or federal, are to the versions in effect in 1992 unless otherwise indicated.

[2] The issues raised by Pharmacia on appeal but not certified to this court include, inter alia, a separation of powers issue, an issue regarding the duty to mitigate damages, various evidentiary issues, and an issue regarding attorney fees and costs. The issues raised by the State on appeal but not certified to this court include, inter alia, the correctness of the circuit court's determination of the forfeiture amount imposed per violation and the

damages were based on impermissible speculation by the jury; and 3) whether the circuit court properly reduced the number of violations. Because each of these issues was correctly resolved in the circuit court, we affirm and remand to the court of appeals.

## I. FACTUAL BACKGROUND

¶ 2. As with most aspects of this case, many of the facts are sharply disputed by the parties. Here we present only the undisputed facts. In the procedural history below we present in greater detail the parties' differing characterizations of the facts at trial. Because of the volume of facts relevant to the certified issues, we also present additional facts during the course of our analysis.

¶ 3. Medicaid is a program jointly funded and managed by the states and the federal government. *Harris v. McRae,* 448 U.S. 297, 301 (1980). Its purpose is to facilitate the provision of health care services to those without the means to pay for them. 42 U.S.C. § 1396. At the federal level, Medicaid is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the aegis of the U.S. Department of Health and Human Services. *Douglas v. Indep. Living Ctr. of S. Cal., Inc.,* 565 U.S. __, 132 S. Ct. 1204, 1208 (2012). In Wisconsin, the program is run by the Department of Health Services ("DHS"). *See generally* Wis. Stat. ch. 46.

¶ 4. Pursuant to federal law, states participating in the Medicaid program must submit "state plans" to CMS to receive federal funding. 42 U.S.C. §§ 1396a and 1396b(a). Such plans are required to "assure that pay-

breadth of the injunction. In our order accepting the certification from the court of appeals we limited our review to the certified issues.

ments are . . . sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A); 42 C.F.R. § 447.204. Federal regulations compel state Medicaid agencies to devise procedures for reimbursing pharmacists who dispense drugs to Medicaid recipients. 42 C.F.R. § 447.518. Under the federal guidelines, the reimbursements may not exceed the lesser of 1) the estimated acquisition cost ("EAC") of the drug, plus a reasonable dispensing fee, or 2) the "usual and customary" price the pharmacy charges to consumers paying for the drug without government assistance. 42 C.F.R. § 447.512(b). The regulations define EAC as the "best estimate of the price generally and currently paid by providers for a drug." 42 C.F.R. § 447.502. Whenever states change their reimbursement policies, they must seek CMS approval to institute the new plan. *See Douglas,* 132 S. Ct. at 1208.

¶ 5. In Wisconsin, reimbursement formulae are drawn up by the legislature as part of the biennial budget process and signed into law by the governor. During that process, the legislature and governor receive extensive input from various lobbying interests, as well as from DHS and other state officials. The litigation leading to the case at bar was principally over one part of the reimbursement formula, a figure known in the industry as an "average wholesale price" ("AWP").[3]

---

[3] There is considerable disagreement here and in other jurisdictions, *see generally, e.g.,* Phuong D. Nguyen, *A Review of Average Wholesale Price Litigation and Comments on the Medicare Modernization Act,* 9 Quinnipiac Health L.J. 249 (2006) (surveying AWP litigation), as to the precise meaning of AWP, and that subject will be discussed below at length. There is also disagreement concerning the formulation and transmittal of

¶ 6. During the period of time implicated by the complaint, AWP played a different role in Wisconsin Medicaid's[4] reimbursement process depending on whether the drug was a generic or a brand.[5] For brand drugs, Medicaid paid pharmacies AWP minus a specific percentage. *Cf. In re McKesson Governmental Entities AWP Litig.,* 767 F. Supp. 2d 263, 267 (D. Mass. 2011) ("Public payors generally reimburse retail pharmacies for brand name drugs based on a percentage off of AWP."). The percentage remained constant for all brand drugs until the next legislative revision in the biennial budget process. Thus, for example, if the formula had been set at AWP minus 10% for a given period, and a pharmacy dispensed to a Medicaid recipient a brand drug with an AWP of $10, Medicaid would pay the pharmacy $9 ($10 AWP minus 10%). Over the years covered by the lawsuit, the percentage deducted from AWP in Wisconsin increased incrementally during various biennial budget sessions.

¶ 7. The reimbursement process is different with respect to generic drugs. For such drugs, Medicaid sets a maximum allowable cost, a number determined by state officials or consultants through independent research in the market. We will elaborate further on that process below where it is relevant to our analysis.

---

AWPs, and that too will be elaborated on in the following section.

[4] Henceforth we will refer to Wisconsin Medicaid simply as "Medicaid."

[5] A brand name drug is a product under patent protection and thus marketed by a single company. A generic drug, by contrast, is a product that has been released from patent protection and is thus available from multiple pharmaceutical manufacturers in the same form. *See generally Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk,* 566 U.S. __, 132 S. Ct. 1670 (2012).

## II. PROCEDURAL HISTORY

¶ 8. In 2004, the State filed a civil action against several dozen large pharmaceutical manufacturers, alleging that each reported inflated AWPs, thereby causing Medicaid to overpay for drugs and violating the DTPA[6] and the Medicaid fraud statute.[7] After several years of extensive discovery, Pharmacia,[8] which manufactures both brand and generic drugs, was the first defendant to go to trial.[9]

---

[6] The relevant provision of the DTPA provides:

No . . . corporation . . . or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any . . . merchandise . . ., directly or indirectly, to the public for sale . . ., shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a . . . notice, . . . bill, circular, pamphlet, letter, . . . or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase [or] sale, . . . which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wisconsin Statutes section 100.18(1).

[7] The relevant provision of the Medicaid fraud statute states that "[n]o person, in connection with medical assistance, may . . . knowingly make or cause to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment." Wis. Stat. § 49.49(4m)(a)2.

[8] Pharmacia is a wholly-owned subsidiary of Pfizer. At trial, evidence was introduced relating to various branches of Pharmacia and predecessor companies. The parties have never suggested that these distinctions are significant to the case. In the interest of clarity, we therefore use the term "Pharmacia" even where other corporate names were employed at trial.

[9] Proceedings involving the other defendants are stayed pending the resolution of this case.

¶ 9. The State sought a jury trial at circuit court, and Pharmacia a bench trial. Applying our case law on the subject, the circuit court concluded that the State was entitled to a jury trial on both statutory claims.

## A. The State's Case at Trial

¶ 10. Over the course of a nine-day trial, the two sides presented radically different versions of the Medicaid reimbursement system, and of Pharmacia's role in that system. The State's account is summarized in this section.

¶ 11. Because of the complexity and dynamism of the pharmaceutical industry, Medicaid required a consistent and broadly applicable formula for determining the appropriate reimbursements for pharmacies that dispensed drugs to Medicaid patients. The agency did not have sufficient staff or resources to collect the information necessary to calculate proper reimbursement rates, so it was dependent upon assistance from companies in the industry.

¶ 12. As with other states throughout the country, the solution that emerged was for pharmaceutical manufacturers like Pharmacia to report certain figures relating to the sales of their products, and for Medicaid to use those figures to calculate reimbursements. The most important of those figures was AWP. Pharmacia provided AWPs for its drugs to First DataBank ("FDB"), an independent company that organized and disseminated information regarding the pharmaceutical industry to Medicaid,[10] which then plugged them into its reimbursement formula.

---

[10] There was actually yet another intermediary involved in the process, Electronic Data Systems, but it served for all intents and purposes as an arm of the state and neither party

¶ 13. Pharmacia, as with all manufacturers, reported AWPs in agreement with Medicaid that the AWPs were supposed to reflect what the name suggested: the average price for which the drug was sold by the wholesaler to the pharmacy. During the early days of Medicaid, this assumption was largely accurate. AWPs did reflect the average price paid by the pharmacies, and Medicaid was able to simply reimburse the pharmacies in those amounts.

¶ 14. Over time, however, the manufacturers began reporting inflated AWPs. They did so to engage in a practice known as "marketing the spread." When a manufacturer "marketed the spread," it reported an inflated AWP to Medicaid and Medicaid then paid the pharmacy more for the drug than the pharmacist paid the wholesaler for the same product. As a consequence, pharmacies had an incentive to buy products from the manufacturer (via a wholesaler) who reported the most inflated AWP, because pharmacies then made a higher profit margin than they would have on drugs made by other manufacturers. In turn, the manufacturer obtained a larger and larger share of the market, as pharmacies became increasingly aware of wider profit-margins on the manufacturer's product. Pharmacia "marketed the spread" along with its competitors, and it reported more and more dramatically inflated AWPs over time.

¶ 15. Medicaid and other officials in Wisconsin knew, to varying degrees and at varying times, that AWP no longer represented an accurate barometer of what pharmacies were paying wholesalers for drugs. Nevertheless, it was confronted with inconsistent and

suggests its role is relevant to the issues before us. For the sake of simplicity, we therefore discuss the transfers of information from Pharmacia as though they were conveyed directly to FDB.

often contradictory information, with considerable disagreement as to how far AWPs were from actual wholesale prices. Consequently, the state was forced to guess as to just how unrealistic AWPs were. After formulating such a guess, the state would then determine a percentage to subtract from AWP in order to derive the reimbursement amounts. That percentage grew over time, as the state acquired more and better information on the magnitude of the inflations. Although the formulae by which AWPs were reduced represented the state's best guess as to the amount of the inflation, it erred on the side of generosity to ensure that no supplier was shortchanged, and its payments were therefore almost universally too high. Thus, the manufacturers, along with everyone else in the supply chain, continued to profit from the false AWPs.

¶ 16. Pharmacia was aware of the benefits accruing by virtue of its misrepresentations, and it took measures to perpetuate the scheme and avoid detection. One such measure was the so-called "charge back," whereby the company would provide wholesalers various secret discounts designed to compensate them for the difference between the amount the pharmacy paid for the products and the amount the wholesaler paid Pharmacia. In this way, the true prices of the drugs were obscured from public view.

¶ 17. If the state had known true AWPs, it would have simply reimbursed pharmacies at those prices. Thus, the damage suffered by the state is the difference between the amount it did pay Pharmacia and the actual wholesale prices[11] for its products, i.e., the true

---

[11] We use "actual wholesale prices" as a shorthand to mean prices that did in fact reflect the average prices that pharmacies were paying wholesalers for the drugs at issue. We do not

average price at which it sold its drugs to wholesalers. Finally, the number of violations committed by Pharmacia is the number of times the state overpaid for a product as the result of an inflated AWP, for that is the truest measure of the company's wrongful conduct.

## B. Pharmacia's Case at Trial

¶ 18. Unsurprisingly, Pharmacia related a very different narrative to the jury, which is summarized in this section. By its account, AWPs are and always were a "benchmark," designed to allow for consistency and stability in reimbursement rates, but never intended to reflect actual prices or their averages. The state was well aware of that fact, and well aware that pharmacists were profiting from Medicaid reimbursements. Such profits do not demonstrate the existence of any fraud; rather, they were necessary and required by federal law to ensure that pharmacies participated in Medicaid. If the profits did not exist, pharmacies would withdraw from the program and indigent patients would lose access to the subsidized medications to which they are entitled.

---

thereby imply any conclusion as to whether the AWPs at issue in the present case were required by law to reflect actual wholesale prices in the sense that Pharmacia had a legal obligation to report different numbers, as that question is not before us. It has not been certified and so remains at the court of appeals. For the same reasons, we will refer to Pharmacia's reported AWPs as "inflated" to reflect the undisputed fact that they did not track actual wholesale prices without implying anything about the "truth" or "falsity" of the AWPs. We recognize that this terminology may engender confusion, but it is unavoidable given the complexity and interrelationship of the certified and uncertified issues. We caution the parties and the court of appeals not to take this opinion as bearing on the proper resolution of the uncertified issues upon remand, as those are not before us.

¶ 19. True wholesale prices were no more accessible to Pharmacia than they were to the state. Such prices are known only to the wholesalers and their pharmacy customers; Pharmacia is not privy to their confidential arrangements. In the absence of that information, Pharmacia calculated AWPs not with reference to transactions between wholesalers and pharmacies, but with reference to wholesale acquisition cost—that is, the amount the wholesalers paid for its products.

¶ 20. In any event, the AWPs upon which the state relied were not Pharmacia's, they were FDB's. FDB committed itself to independently verifying the AWPs it provided to the state by conducting surveys of wholesalers. Pharmacia was not responsible for the AWPs published by FDB, nor should it be held accountable for any characterization of the AWPs put forth by FDB.

¶ 21. Had the state desired other pricing information, it could easily have acquired it. FDB offered a variety of data encompassing a wide range of transactions in the pharmaceutical industry. The state opted for AWP, knowing full well what it signified, and what it did not. Alternatively, the state could have declined FDB's services altogether and gathered the necessary information itself. It already had access to pharmaceutical pricing data through the extensive drug purchases Wisconsin makes outside of the Medicaid program, for example those obtained for use in correctional facilities. More simply, it could just have asked Pharmacia for the data it wanted, a straightforward approach it never took.

¶ 22. Medicaid's reimbursement formulae were a function of the political process. As each budget was being prepared, various government officials would recommend that the rates be lowered by substantial amounts to generate taxpayer savings. At the same time, a vigorous pharmacy lobby would counter that the reimbursements were more accurate than alleged, and

528

that significant reductions would eliminate their profit margins and force them to withdraw from Medicaid, thereby depriving eligible individuals of access to necessary medication. The legislature and governor took both perspectives into consideration and came up with a reimbursement rate that balanced the interest in fiscal responsibility with the interest in ensuring access to subsidized medicine. Pharmacia should not be punished for a political decision made by Wisconsin.

## C. Verdict and Post-Trial Proceedings

¶ 23. The jury found Pharmacia liable for violating both the DTPA and the Medicaid fraud statute. It awarded $2 million in damages for the DTPA claim and $7 million for the Medicaid fraud claim, for a total of $9 million in damages. Answering a special verdict question, the jury concluded that Pharmacia violated the Medicaid fraud statute 1,440,000 times, the number of times the State alleged that Medicaid had overpaid for the company's products as a result of the inflated AWPs. Pharmacia then successfully moved the circuit court to vacate the number of violations found by the jury. During post-trial proceedings regarding the issue, the circuit court determined that the record supported a finding of 4,578 violations. It imposed a $1,000 forfeiture on each violation, totaling $4,578,000.

¶ 24. Both parties appealed, raising numerous issues. The court of appeals certified three: 1) whether the State was entitled to a jury trial; 2) whether the damages were based on impermissible speculation by the jury; and 3) whether the circuit court properly reduced the number of violations. To expedite the resolution of this important case, we accepted the certification and limited our review to the certified issues. We now affirm the circuit court on each of those issues.

## III. STANDARD OF REVIEW

■

¶ 25. The first issue—whether the State had a constitutional right to a jury trial—hinges on our reading of the Wisconsin Constitution, and is therefore subject to our independent review. *Harvot v. Solo Cup Co.*, 2009 WI 85, ¶ 32, 320 Wis. 2d 1, 768 N.W.2d 176 (citations omitted).

¶ 26. On the second issue—whether the jury's damage award was impermissibly speculative—we will not reverse the award if it was "within the realm of reason in view of the evidence." *Rupp v. Travelers Indem. Co.*, 17 Wis. 2d 16, 26, 115 N.W.2d 612 (1962). Under this standard, we search the record for credible evidence to support the award, and view that evidence in the light most favorable to the jury's determination. *Springen v. Ager Plumbing & Heating, Inc.*, 19 Wis. 2d 487, 489, 120 N.W.2d 692 (1963).

■■■■

¶ 27. With respect to the third issue—the question of whether the circuit court properly reduced the number of Medicaid fraud violations—the standard of review depends on whether the jury's alleged error is properly characterized as an error of law or of fact. Because the circuit court sufficiently instructed the jury on what constituted a violation, the jury's error is best understood as one of fact. We therefore apply a sufficiency of the evidence standard of review to the third issue. *Morden v. Cont'l AG*, 2000 WI 51, ¶ 38, 235 Wis. 2d 325, 611 N.W.2d 659. That standard requires us to overturn a circuit court's decision to change the jury's answer if there is "any credible evidence" to support the verdict, direct or inferential. *Hanson v. Am. Family Mut. Ins. Co.*, 2006 WI 97, ¶ 18, 294 Wis. 2d 149, 716 N.W.2d

866 (internal quotation marks and citation omitted). As with the speculativeness issue, we answer this question while viewing the record in the light most favorable to the jury's determination. *Morden,* 235 Wis. 2d 325, ¶ 41. Because the circuit court was better situated to assess the evidence than we are, we also accord its weighing of the evidence "substantial deference." *D.L. Anderson's Lakeside Leisure Co. v. Anderson,* 2008 WI 126, ¶ 59, 314 Wis. 2d 560, 757 N.W.2d 803 (internal quotation marks and citations omitted). Therefore, we will accept the circuit court's reduction of the number of violations unless the record reveals that the number it found was "clearly wrong." *Richards v. Mendivil,* 200 Wis. 2d 665, 671–72, 548 N.W.2d 85 (Ct. App. 1996) (internal quotation marks and citation omitted).

## IV. DISCUSSION

¶ 28. We first consider whether the State had a constitutional right to a jury trial and conclude that it did. We then consider whether the jury's damage award was impermissibly speculative and determine that it was not. Finally, we consider whether the circuit court properly reduced the number of violations and hold that it did.

### A. The State Had a Constitutional Right to a Jury Trial

¶ 29. The Wisconsin Constitution provides that "[t]he right of trial by jury shall remain inviolate, and shall extend to all cases at law." Wis. Const. art. I, § 5. It is well-settled that the provision guarantees the right to a civil jury trial as the right existed at the time our

state's constitution was adopted in 1848. *Town of Burke v. City of Madison,* 17 Wis. 2d 623, 635, 117 N.W.2d 580 (1962). When the right to a civil jury trial for a particular cause of action is in dispute, we pose a two-pronged test to resolve the dispute. *Vill. Food & Liquor Mart v. H&S Petroleum, Inc.,* 2002 WI 92, ¶ 11, 254 Wis. 2d 478, 647 N.W.2d 177 ("the *Village Food* test"). First, we ask whether the "cause of action created by statute existed, was known, or was recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848." *Id.* Next we consider whether the cause of action was viewed as "at law" in 1848. *Id.*

¶ 30. The question of whether the State had a constitutional right to a jury trial reduces to two separate inquiries: 1) whether the State was entitled to a jury trial on the DTPA claim and 2) whether it was entitled to one on the Medicaid fraud claim. The circuit court answered both questions in the affirmative. Because both prongs of the test are satisfied by both causes of action, we agree with the circuit court that the State was entitled to a jury trial and therefore affirm its ruling.

### 1. The State Had a Constitutional Right to a Jury Trial on its DTPA Claim

¶ 31. The State's DTPA claim meets both prongs of the test: it was recognized at common law in 1848 and it was regarded as "at law" at that time. Accordingly, we conclude that the State had a constitutional right to a jury trial on its DTPA claim.

■

¶ 32. We first analyze whether the DTPA claim "existed, was known, or was recognized at common law at the time of the adoption of the Wisconsin Constitu-

tion in 1848." *Id.* The State submits that the DTPA claim is an essential counterpart to the common law claim of "cheating." The circuit court agreed, and so too do we.

¶ 33. A common law claim can be regarded as the essential counterpart to a statutory cause of action in a civil jury trial analysis where the two share a similar purpose. *Harvot,* 320 Wis. 2d 1, ¶ 72. The DTPA and common law cheating share such a purpose: combatting deceptive commercial conduct.

¶ 34. When ascertaining whether a statutory cause of action had an essential common law counterpart in 1848, we often resort to Sir William Blackstone's *Commentaries on the Laws of England* (1778) (hereinafter "Blackstone"). *See Harvot,* 320 Wis. 2d 1, ¶ 84; *State v. Schweda,* 2007 WI 100, ¶ 23, 303 Wis. 2d 353, 736 N.W.2d 49; *Dane Cnty. v. McGrew,* 2005 WI 130, ¶ 23 n.18, 285 Wis. 2d 519, 699 N.W.2d 890 (collecting cases). Blackstone categorizes cheating as an "offence . . . against public trade." 4 Blackstone at *157. The DTPA announces, by its very name, that it targets a similar category of wrongful conduct, namely, deceptive trade practices.

¶ 35. Similarly, Blackstone's description of cheating tracks the DTPA's characterization of deceptive trade practices. Blackstone notes that the object of the common law rule is to "prevent deceits in particular trades." *Id.* As examples of such deceits, Blackstone cites, amongst other conduct, "the offence of selling by false weights and measures," the offense of "playing with false dice," and the offense of defrauding "another of any valuable chattels by colour of any false token, counterfeit letter, or false pretence." *Id.* at *157–58 (formatting altered). Although the DTPA speaks in less

antiquated terms, it displays a similar emphasis on attempts to profit through deception. *Tietsworth v. Harley-Davidson, Inc.*, 2003 WI App 75, ¶ 24, 261 Wis. 2d 755, 661 N.W.2d 450 ("[T]he DTPA is a broad remedial statute designed to protect the public from all untrue, deceptive or misleading representations made in sales promotions.") (internal quotation marks and citation omitted), *reversed on other grounds by* 2007 WI 97, 303 Wis. 2d 94, 735 N.W.2d 418. We conclude, therefore, that both the common law cause of action of cheating and the DTPA combat analogous practices.

¶ 36. In Pharmacia's view, the Wisconsin courts have already settled that there is no right to a jury trial for an action brought pursuant to the DTPA. For that proposition, it relies upon *State v. Ameritech Corp.*, 185 Wis. 2d 686, 517 N.W.2d 705 (Ct. App. 1994). *Ameritech* did indeed hold as much, but the holding is no longer good law. The court of appeals there employed the "codification" test, whereby a statutory cause of action carries with it a right to a jury trial if "the statute codifies an action known to the common law in 1848." *Id.* at 690. In *Village Food* we expressly renounced that test because it construed our precedent "too narrowly." 254 Wis. 2d 478, ¶ 11. Instead, we reaffirmed the two-prong test set forth above. *Id.* Consequently, Pharmacia may not rely upon *Ameritech*'s holding, as its holding resulted from the application of an erroneous and defunct test.[12] Our ascertainment of a jury trial

---

[12] *Ameritech* is no longer good law only with respect to its discussion and application of the test for determining whether there is a right to a civil jury trial, not with respect to any of its other holdings, which we explicitly and specifically preserve for their precedential value. *See Blum v. 1st Auto & Cas. Ins. Co.*, 2010 WI 78, ¶ 42, 326 Wis. 2d 729, 786 N.W.2d 78 (holding "that when the supreme court overrules a court of appeals decision,

right under the DTPA must be performed according to the appropriate test, i.e., the one enumerated in *Village Food.*

¶ 37. Pharmacia also seeks to apply that test, but it does so unconvincingly. It submits that the elements of common law cheating and those of the DTPA do not match each other identically. A party accusing another of cheating at common law was required to prove that the individual: 1) performed an act calculated to deceive; 2) the act was aimed at, or affected, the public or the individual; and 3) "ordinary prudence" would not have protected the victim against the fraud. *See, e.g., People v. Cummings,* 46 P. 284, 284 (Cal. 1896); *Hammer v. State,* 89 N.E. 850, 852 (Ind. 1909). In comparison, a plaintiff alleging violations of the DTPA must prove: 1) that the defendant made a representation to the public with the intent to induce an obligation; 2) that the representation was untrue, deceptive or misleading; and 3) that the representation caused the plaintiff a pecuniary loss. *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.,* 2007 WI 70, ¶ 19, 301 Wis. 2d 109, 732 N.W.2d 792 (internal quotation marks and citations omitted). Pharmacia focuses on the "ordinary prudence" element of common law cheating, arguing that it has no essential counterpart in the elements of the DTPA and that no right to a jury trial therefore exists.

¶ 38. As a preliminary matter, we reject Pharmacia's insinuation that a statutory cause of action carries no constitutional right to a jury trial merely because the elements of that cause of action and those of

the court of appeals decision no longer possesses any precedential value, unless this court expressly states otherwise").

the purported common law claim are not identical. Such an approach would restore by another name the "codification" test articulated in *Ameritech* and unequivocally abandoned in *Village Food*.

¶ 39. The real question is whether the divergence between the elements of the DTPA and those of common law cheating is sufficiently significant to demonstrate that the State had no right to a jury trial. We conclude that it is not, and therefore affirm the circuit court's decision to grant the jury trial.

¶ 40. To support its view that the elements of common law cheating are too distinct from those of the DTPA to give rise to a jury trial right, Pharmacia relies principally upon *Schweda*. There, we determined that no jury trial right attached to various environmental statutory causes of action. *Schweda*, 303 Wis. 2d 353, ¶ 14. We rejected the proffered analogy between those statutes and common law nuisance because the latter was a "sprawling concept" that "could encompass a vast array of causes of action," whereas the former applied to a much narrower realm of conduct. *Id.*, ¶ 32. In drawing that distinction, we emphasized that "[t]he breadth of nuisance is so great that we must narrowly construe the actions that we analogize to" it. *Id.*, ¶ 40.

¶ 41. Common law cheating does not capture nearly so wide a swath of activity as does nuisance. On the contrary, it is cabined to a similar field as that covered by the DTPA itself. *Compare Tietsworth*, 261 Wis. 2d 755, ¶ 24 (characterizing the DTPA) *with Cummings*, 46 P. at 284 (describing common law cheating). As a result, *Schweda*'s analysis did not compel a bench trial in the instant case.

¶ 42. We acknowledge that *Schweda* called attention to the elements of nuisance and those of the environmental statutes in play in that case. In particu-

536

lar, the opinion observed that a claim sounding in common law nuisance was required to prove "substantial and unreasonable harm to interests in the use and enjoyment of land." *Schweda,* 303 Wis. 2d 353, ¶ 35. It contrasted that requirement with modern environmental laws, which "regulate more subtle and attenuated harms than the common law of nuisance does." *Id.* (quoting *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps Of Eng'rs,* 101 F.3d 503, 505 (7th Cir. 1996)). It is clear from this quote that the problem with the analogy between the elements of common law nuisance and those of the environmental laws was not simply that they were not identical. Rather, the problem was that all of the similarities between the two flowed from the fact that nuisance was so broad as to encompass *all* environmental laws.

¶ 43. Given the context of these comments in *Schweda,* one cannot escape the conclusion that no such deficiency plagues the analogy between common law cheating and the DTPA. Unlike nuisance, the reasonable reliance requirement does not highlight any substantial difference in the *breadth* of the two laws being compared. Common law cheating covers the same substantive area of conduct as does the DTPA, and the difference in elements between the two is insufficient to outweigh the similarities. Accordingly, we conclude that the cause of action created by the DTPA "was recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848" and the first prong of the *Village Food* test is therefore satisfied with respect to that cause of action. *Vill. Food,* 254 Wis. 2d 478, ¶ 11.

■■■■

¶ 44. Pharmacia does not deny that common law cheating was regarded as "at law" in 1848, and there is

no reason to believe it was not. *See* 3 Blackstone at \*165 (noting that a plaintiff can seek damages in a common law cheating action); *see also Josma v. W. Steel Car & Foundry Co.*, 94 N.E. 945, 946 (Ill. 1911) (same); *Vill. Food*, 254 Wis. 2d 478, ¶ 33 ("An action seeking money damages is one at law."). Consequently, common law cheating was considered "at law" in 1848, both prongs of the *Village Food* test are satisfied with respect to the DTPA claim, and the State was entitled to a jury trial on that claim.

## 2. The State was Entitled to a Jury Trial on its Medicaid Fraud Claim

¶ 45. Applying the *Village Food* test to the State's Medicaid fraud claim, we conclude that Medicaid fraud is an essential counterpart to common law fraud and that common law fraud was considered "at law" in 1848. Thus, we affirm the circuit court's decision to grant the State a jury trial on its Medicaid fraud claim.

### a. Common Law Fraud is an Essential Counterpart to Medicaid Fraud

¶ 46. The State offers common law fraud as the "essential counterpart" to Medicaid fraud for purposes of the first prong of the *Village Food* test.

■■

¶ 47. The Medicaid fraud statute and common law fraud target similar conduct. *See Schweda*, 303 Wis. 2d 353, ¶ 35 (examining the conduct targeted by causes of action as part of the jury trial right inquiry). The Medicaid fraud statute is centrally concerned with "false statement[s] or representation[s] of . . . material

fact for use in determining rights to a benefit or payment." Wis. Stat. § 49.49(4m)(a)2. Setting to one side for the moment the fact that the statute is limited to a narrow species of fraud (that which takes place in medical assistance programs), it is apparent what sort of practices it seeks to prohibit: deceptive conduct designed to enrich one party at the expense of another. Common law fraud historically targeted a similar range of conduct, combatting deceptive behavior in a variety of business relationships and thereby protecting the integrity of the market. *See Pasley v. Freeman,* (1789) 100 Eng. Rep. 450 (K.B.) 457, 3 T.R. 51, 64 (holding that an action for "deceit lies when a man does any deceit to the damage of another").

¶ 48. Pharmacia submits that the Medicaid fraud statute carries no jury trial right because the medical assistance programs it governs did not exist in 1848. We decline to address Pharmacia's historical premise because we disagree with its method of analysis. A statute that creates a cause of action with an essential counterpart at common law becomes no less an essential counterpart simply because it addresses a narrower range of practices. In other words, if the legislature focuses and directs the principles of common law fraud to a specific realm—Medicaid—it does not strip a litigant of his right to a jury trial where it would otherwise exist. Were we to adopt Pharmacia's reasoning, a legislative enactment clearly modeled on a common law cause of action but applied to a specific context would carry no right to a jury trial. *See, e.g., Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 344 (2005) (emphasizing the "common-law roots of . . . securities fraud action[s]"). In such circumstances, to deprive plaintiffs of a jury right based not on the substance of the law at issue, but upon historical

539

happenstance, would be an absurd result, and we therefore reject Pharmacia's argument.

¶ 49. To substantiate its contention regarding the relatively recent advent of medical assistance programs, Pharmacia cites *Harvot.* It finds in that decision a holding that where "modern social legislation" was "unheard of" in 1848, there can be no essential common law counterpart to the legislation for purposes of a jury trial right. We read *Harvot* differently. In that decision, we upheld a circuit court ruling denying a jury demand in an action brought under the Wisconsin Family and Medical Leave Act (WFMLA). It is true, as Pharmacia says, that we noted in *Harvot* that the WFMLA represents "modern social legislation" of a type that "was quite unheard of in 1848." 320 Wis. 2d 1, ¶ 80. Contrary to Pharmacia's intimation, however, that sentence represents only one component of the decision's reasoning, not its overall holding.

¶ 50. In *Harvot,* we ultimately rejected the plaintiff's claim to a jury trial right because "the most analogous common law cause of action" that the plaintiff offered to the court was essentially a claim for the breach of an employment contract. 320 Wis. 2d 1, ¶ 85. The purpose of such a claim, we reasoned, was "to ensure that the . . . employee . . . was cared for and compensated as he was promised." *Id.,* ¶ 86. It was not, like the WFMLA, motivated by an intent to help employees "balance work and family demands." *Id.*

¶ 51. Seen in its context, the "modern social legislation" language from *Harvot* does not avail Pharmacia. Medicaid fraud, unlike the WFMLA, is in fact motivated by a purpose closely similar to the purpose of its suggested common law forebear: protecting the integrity of business relationships and market transac-

tions. *See generally* Jason Chimon, George C. Chipev, & Timothy Feulner, *Health Care Fraud,* 48 Am. Crim. L. Rev. 783 (2011) (conducting general review of health care fraud law). The fact that the Medicaid fraud statute projected those concerns on a more contemporary screen does not render the fundamental purpose substantively different. Indeed, the common law as a whole adjusts to historical circumstance, *see* O. Holmes, 1 *The Common Law* (1881) ("The law embodies the story of a nation's development through many centuries . . . ."), and this is particularly true of common law fraud. *See, e.g.,* Samuel W. Buell, *What is Securities Fraud?,* 61 Duke L.J. 511, 522 (2011) ("[F]raud is a legal concept designed to adapt alongside the evolving behaviors that it targets.") (citing, in part, *Stonemets v. Head,* 154 S.W. 108, 114 (Mo. 1913) ("Fraud is kaleidoscopic, infinite. Fraud being infinite and taking on protean form at will, were courts to cramp themselves by defining it with a hard and fast definition, their jurisdiction would be cunningly circumvented at once by new schemes beyond the definition.")). It would therefore be especially illogical for us to confine a jury trial right to only those fraud statutes which mimic the common law as it was in 1848, when the common law in 1848 could not imagine many of the contexts in which fraud operates today. We decline to rest an important constitutional right on historical vicissitude.

¶ 52. Pharmacia also compares the elements of Medicaid fraud with those of common law fraud, insisting that they differ in crucial respects. While we agree that this line of inquiry is relevant, *see Schweda,* 303 Wis. 2d 353, ¶ 35 (comparing elements of causes of action as part of a jury trial right analysis), we disagree with Pharmacia's conclusion. At common law, a plaintiff

alleging fraud must prove: 1) a representation of material fact; 2) the representation's falsity; 3) the intent to deceive (or reckless disregard for truth or falsity); 4) intent to defraud or to induce action; 5) justifiable reliance by the deceived party. *See Krause v. Busacker,* 105 Wis. 350, 350, 81 N.W. 406 (1900); *Kaloti Enters., Inc. v. Kellogg Sales Co.,* 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205. Although no published decision from the Wisconsin courts has set forth the elements of the Medicaid fraud statute, they are easily deduced from the statute: 1) knowingly making or causing to be made; 2) a false statement or representation of material fact; 3) for use in determining rights to a benefit or payment in connection with medical assistance. Wis. Stat. § 49.49(4m)(a)2.; *see also United States v. Laughlin,* 26 F.3d 1523, 1526–29 (10th Cir. 1994) (discussing the elements of federal Medicaid fraud statute). Aside from the medical assistance requirement addressed above, the only divergence between the elements advanced by Pharmacia is the presence of reasonable reliance in common law fraud and its absence from Medicaid fraud.

¶ 53. We do not believe that this discrepancy, such as it is, outweighs the closely similar purposes of the two laws. First, although the Medicaid fraud statute does not include the term "reasonable reliance," it does require a showing that the deceptive statement was made "for use in determining rights to a benefit or payment in connection with medical assistance." Wis. Stat. § 49.49(4m)(a)2. By inserting such language into the statute, the legislature indicated that Medicaid fraud could be substantiated only by proof that the false statement played some role in the state's calculation of payments. Though that requirement is not identical to reasonable reliance, it is also not wholly dissimilar, as

both require evidence that the culpable conduct influenced the decision-making process of the relevant actor. In any event, the difference between the two is insufficient to override the substantial overlap in purpose between Medicaid fraud and common law fraud. Accordingly, we conclude that the cause of action created by the Medicaid fraud statute "was recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848" and the first prong of the *Village Food* test is therefore satisfied with respect to that cause of action. *Vill. Food,* 254 Wis. 2d 478, ¶ 11.

b. Common Law Fraud was "At Law" in 1848
for Purposes of the State's Right to a Jury Trial

¶ 54. In their discussions regarding the State's right to a jury trial on its Medicaid fraud claim, the parties quarrel over the nature of the forfeitures and damages sought by the State. Pharmacia contends that the State pursued *in personam* forfeitures, which were unrecognized at common law in 1848, and that its damage claim was in actuality an equitable one, and thus properly resolved in a bench trial. The State takes the opposite position on both points. Although they do not frame this debate in terms of whether common law fraud was "at law" for purposes of the State's claims, that is the only conceivable relevance it has for the certified questions.[13]

¶ 55. At common law, an action for fraud could sound either at law or in equity. *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 143–44 (2d Cir. 1999),

---

[13] Otherwise, the argument reduces to a dispute over which particular matters should have been submitted to the jury, and which to the trial judge, and that question lies outside the scope of our present review.

543

*abrogated on other grounds by Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204 (2002). When heard in a court of equity, fraud was defined in a looser, more flexible fashion than it was in a legal proceeding. *See Aaron v. SEC,* 446 U.S. 680, 693 (1980) ("[F]raud has a broader meaning in equity than at law.") (internal brackets, quotation marks, and citations omitted). We need not delve deeper into the distinction, however, because common law fraud, as it was at law in 1848, is sufficiently analogous to Medicaid fraud to satisfy the second prong of the test. *Compare Pasley v. Freeman,* (1789) 100 Eng. Rep. 450 (K.B.) 457, 3 T.R. 51, 64 (describing common law fraud at law) *with* Wis. Stat. § 49.49(4m)(a)2. (setting forth the elements of Medicaid fraud). Pharmacia's focus on the equitable remedies purportedly sought by the State is misplaced. Regardless of whether or not the State pursued *some* equitable relief, the question before us now is whether the cause of action as a whole is an essential counterpart to a cause of action considered "at law" in 1848. We have answered that question in the affirmative. Consequently, the second prong of the *Village Food* test is met, and the State was entitled to a jury trial on its Medicaid fraud claim.

### B. The Jury's Damage Award of $9 Million for Pharmacia's Inflated AWPs in Connection with Brand and Generic Drugs Was not Impermissibly Speculative

¶ 56. The next issue before us is whether the jury engaged in impermissible speculation in determining the damage award. Because the damages were based on reasonable inferences drawn by the jury from credible evidence, we hold that it did not speculate and accordingly uphold the award.

544

¶ 57. The jury's damage award of $9 million reflected the State's request for an award in approximately that amount.[14] The request in turn reflected the State's position, communicated through expert testimony and reiterated at closing argument, that approximately $9 million represented the amount of money Medicaid would have saved had it received, and used, actual wholesale prices. Specifically, Lawrence De-Brock, Professor of Economics and Dean of the College of Business at the University of Illinois ("Professor DeBrock"), explained to the jury how he calculated Wisconsin's damages for both brand name and generic drugs. Comparing Medicaid records to subpoenaed documents detailing wholesale drug transactions in the private market, he found the difference between what Medicaid reimbursed pharmacies and the prices actually paid by the pharmacies to their wholesalers. His estimate of that difference was advanced by the State at closing argument and presumably adopted by the jury.

¶ 58. Pharmacia attacks the damage award because Medicaid reimbursement was set through the political process and, in Pharmacia's view, there was no way the jury could sufficiently predict what the legislature and governor would have done with different AWPs.[15]

---

[14] The State's damages expert suggested that the most appropriate calculation of damages was $9,527,180. At closing argument, the State requested a reduced damage award of $9,146,180 because of an issue regarding the statute of limitations. The jury awarded $9 million. Pharmacia does not argue that the discrepancy between the two amounts has any significance to our analysis.

[15] Pharmacia further contends that the evidence at trial indicated that Wisconsin political officials knowingly used higher AWPs to pay pharmacies more than their acquisition

¶ 59. The damage award was calculated with reference to the AWPs reported by Pharmacia. Because brand drugs are reimbursed by a different process than are generic drugs, we discuss them in turn.

### 1. The Jury Did Not Impermissibly Speculate as to the Damage Award with Respect to Brand Name Drugs

¶ 60. The jury did not impermissibly speculate as to the damage award with respect to brand name drugs because the jury received credible evidence supporting a reasonable inference that, had actual wholesale prices been provided, the legislature would have used them to reimburse pharmacies for brand name drugs.

¶ 61. Many of the facts regarding the reimbursement process are sharply disputed by the parties. Since we are bound to uphold a damage award where it is based on credible evidence viewed in the light most

---

costs in order to ensure that they participated in Medicaid. As Pharmacia sees it, such evidence disproved the assumption upon which the jury grounded its damage award: that the legislature desired actual wholesale prices and would have reimbursed pharmacies in accordance with such prices. This argument essentially goes to liability, not damages. That is, if there was insufficient evidence to sustain the State's claim that it would have paid lower AWPs if they had been published, then the damage award would not be *lower*, it would be zero. For in that event, there would have been no injury and thus no fraud. It is well-settled that "the uncertainty which prevents recovery is uncertainty as to the *fact* of the damage and not to its amount." *Eden Stone Co. v. Oakfield Stone Co.,* 166 Wis. 2d 105, 125, 479 N.W.2d 557 (Ct. App. 1991)(emphasis altered)(citing *Cutler Cranberry Co. v. Oakdale Elec. Co-op.,* 78 Wis. 2d 222, 233, 254 N.W.2d 234 (1977)). The court of appeals did not certify the question of Pharmacia's liability, so we do not address this argument.

favorable to the jury's determination, *Springen,* 19 Wis. 2d at 489, we focus on the reimbursement process as it was characterized to the jury at trial.

¶ 62. The evidence at trial unequivocally revealed that, at all times relevant to the case, Medicaid paid pharmacies AWP minus a specific percentage for brand name drugs. The parties and their witnesses likewise agreed that Pharmacia reported AWPs that did not track the actual prices pharmacies were paying wholesalers for drugs.[16] The dispute is over how reimbursement rates would have changed, if at all, had accurate prices been conveyed to Medicaid. As the following discussion demonstrates, the jury was presented with sufficient credible evidence to support a reasonable inference that reimbursement rates would have been reduced to reflect actual wholesale prices, had they been provided. Accordingly, we conclude that the jury did not impermissibly speculate in reaching its damage award with respect to brand name drugs.

¶ 63. First, the jury considered evidence that the federal Office of Inspector General for CMS ("OIG") provided to Wisconsin Medicaid officials the results of a national audit of pharmacy acquisition costs for drugs reimbursed under Medicaid. The report indicated that Wisconsin pharmacies were purchasing brand name drugs at an average of 20.25% below the published AWPs, during a period when the Wisconsin Medicaid reimbursement rate was AWP minus 11.25%. The OIG advised DHS to consider the report in making changes

---

[16] At trial, Pharmacia presented evidence and argument to convince the jury that the company was not in fact responsible for the published AWPs because FDB alone determined some of them and confirmed and vouched for all of them. That issue, again, relates to liability and not to whether the damage award was speculative, and we consequently do not address it.

to pharmacy reimbursement policy. Most important, the State submitted evidence that the legislature ultimately reduced the reimbursement rates just as the OIG recommended. Such evidence strongly supports the jury's determination that Wisconsin would have paid Pharmacia prices in line with actual wholesale prices if such prices had been faithfully reported, and it therefore strongly supports the damage award.

¶ 64. Second, the jury heard from Amie Goldman ("Goldman"), a former analyst with the Legislative Fiscal Bureau, a nonpartisan agency tasked with providing fiscal analyses to the Wisconsin legislature for use in formulating the state's biennial budget. While on the stand, Goldman recounted several meetings she had with agents representing various lobbying interests, as well as DHS and other officials, as part of her effort to compile a comprehensive report advising the legislature on the ramifications of adopting alternative Medicaid reimbursement formulae. Goldman explained that her agency, as well as legislators themselves, were unsure how closely AWPs tracked actual wholesale prices in light of conflicting input from different actors. Ultimately, she and her colleagues both "wanted" and "needed accurate information" regarding AWPs. Had such information been provided, Goldman testified, there would have been no need for her to prepare the report, as the legislature would have simply reimbursed according to actual wholesale prices. Thus, Goldman's testimony substantially bolstered the State's position that inflated AWPs caused Wisconsin to overpay for Medicaid drugs, and provided a credible foundation for the jury to calculate damages.

¶ 65. Other witnesses called by the State confirmed the picture drawn by the OIG report and Goldman's testimony, and provided yet further evidence

that Pharmacia damaged the state by providing inflated AWPs when actual wholesale prices would have resulted in lower reimbursements. For instance, Mark W. Moody, a former director of Medicaid who served on the governor's commission on pharmacy reimbursement, testified that it would have assisted the commission in reaching a consensus on adjusting Medicaid reimbursement rates if they had been provided information that reflected actual wholesale prices. Additionally, Dr. Gerard Anderson, the Director of the Center for Hospital Finance and Management at the Johns Hopkins Bloomberg School of Public Health, opined that his survey of Pharmacia and government documents revealed that "all of Pharmacia's AWPs . . . were false, and because they were false, the Wisconsin Medicaid program overpaid providers, resulting in excess payments by the Wisconsin Medicaid programs."

¶ 66. Lastly, Professor DeBrock provided a well-informed, detailed basis for the jury to calculate Wisconsin's damages. He compared Medicaid records with subpoenaed documents detailing wholesale drug transactions in the private market and found the difference between what Medicaid reimbursed pharmacies and the prices actually paid by the pharmacies to their wholesalers. His estimate of that difference—$9,527,180 —was advanced by the State at closing argument (reduced to $9,146,180 as a result of statute of limitations considerations) and presumably formed the basis for the jury's damage award.

¶ 67. In summary, there was plentiful evidence from a wide range of credible witnesses with extensive experience in the field to substantiate the State's argument that the legislature would have reduced brand drug reimbursements to reflect actual wholesale prices had Pharmacia offered them.

¶ 68. Challenging the credibility of the evidence summarized above, Pharmacia emphasizes the testimony it proffered to rebut the State's account. In particular, Pharmacia asserts that sounder evidence supported a conclusion that the legislature knew that the reported AWPs did not track accurate wholesale prices. Indeed, Pharmacia argues, the greater weight of the evidence demonstrated that the state did in fact have access to actual pricing information and made the deliberate choice not to rely upon it. In support of that contention, Pharmacia presented evidence suggesting that various state officials received actual pricing information, as well as reports that the reimbursement rates were substantially higher than pharmacies' actual acquisition costs. Other evidence was advanced to substantiate Pharmacia's argument that the legislature repeatedly declined to follow various recommendations to lower reimbursement rates in order to bring them closer to actual prices.[17] Several witnesses informed the jury that various branches of the Wisconsin government, most prominently the prison and hospital systems, paid wholesalers directly for medication and thus knew the prices such drugs commanded on the open market.

[17] For example, James Vavra ("Vavra"), Director of the Benefits Management Bureau in the Division of Health Care Access and Accountability for Wisconsin Medicaid, testified that his office provided information to DHS in formulating budget issue papers, which were used by the governor and legislature to make changes to DHS's budget. Vavra further testified that his office recommended lower reimbursement rates in accordance with the OIG report, in order to bring Wisconsin in line with actual acquisition costs for pharmacies. Finally, he testified that the legislature repeatedly rejected such proposals. Pharmacia admitted several exhibits to support Vavra's testimony.

¶ 69. It is true, as Pharmacia submits, that the jury heard accounts that clashed with the State's characterization of the legislature's knowledge and intentions. But there are factual disputes in every jury trial; indeed, there would be no need for a jury trial at all if there were not. *See, e.g., Tri City Nat'l. Bank v. Fed. Ins. Co.*, 2004 WI App 12, ¶ 34, 268 Wis. 2d 785, 674 N.W.2d 617 ("Juries resolve factual disputes."). It would be especially surprising if the evidence had been consistent and clear in the trial here, given that it involved an enormously complex process with numerous moving parts. Nevertheless, our inquiry asks only whether the record contains credible evidence, viewed in the light most favorable to the jury's determination, to support the damages awarded. *Springen*, 19 Wis. 2d at 489.

¶ 70. Applying that standard, it cannot be said that the damages here were speculative simply because *some* officials in state government received *some* information indicating that *some* AWPs were inflated above actual prices by *some* amount. The State has never alleged, in any court, at any stage of the proceedings, that *no one* in the Wisconsin government knew that AWPs did not reflect actual wholesale prices. What it alleged at trial, and what it continues to allege, is that no one in Wisconsin state government knew the exact degree of inflation, and that that uncertainty caused it to overpay for Medicaid drugs. The jury was given a compelling account of that uncertainty, as it heard testimony describing a chaotic, confusing process in which decision-makers received dramatically different reports from different sources. Indeed, Pharmacia's evidence only strengthened that account, because it described even more disagreements among the actors feeding information to the state. *Cf. Commonwealth v. TAP Pharm. Prods.*, 36 A.3d 1112, 1152 (Pa. Commw.

Ct. 2011) ("[G]iven the trial judge's findings regarding the significant *confusion* over AWP, we reject [the] argument that it is clear that the Commonwealth *knowingly* asserted in earlier litigation that it intended its reimbursement rates to be more generous than other entities in order to provide pharmacists a reasonable profit on ingredient costs.") (emphasis altered); *but see AstraZeneca LP v. State,* 41 So. 3d 15, 29–30 (Ala. 2009)(reversing judgment in AWP litigation against pharmaceutical company for fraudulent misrepresentation because the state "had actual knowledge . . . that published AWPs were not net prices" in the form of information known to certain Alabama Medicaid officials).

¶ 71. In light of these conflicts, we have concluded that the jury's damage award as to brand name drugs was based on a reasonable inference flowing from credible evidence. When, as here, "facts are in dispute or the evidence is such that fair-minded [jurors] may draw different inferences," it is for the jurors, not for us, to determine "what seems to them to be the most reasonable inference." *Weber v. Chicago & Nw. Transp. Co.,* 191 Wis. 2d 626, 636, 530 N.W.2d 25 (Ct. App. 1995) (quoting *Lavender v. Kurn,* 327 U.S. 645, 653 (1946)). The jury had ample evidence to credit suggesting that Wisconsin officials did not know with certainty actual wholesale prices, that Pharmacia's published prices provided the basis for its reimbursement rates, and that Medicaid paid more than it intended to and rightfully owed as a consequence. That evidence was offered by several witnesses with extensive experience in different areas of the Wisconsin Medicaid process, and by numerous documents from official bodies and others involved in the formulation and payment of the reimbursements.

The jury chose who among the witnesses to believe and we are not at liberty to disturb its damage award merely because Pharmacia would rather they had believed others. *See Fischer v. Cleveland Punch & Shear Works Co.,* 91 Wis. 2d 85, 92, 280 N.W.2d 280 (1979) ("The credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, and where more than one inference can be drawn from the evidence, this court must accept the inference drawn by the jury.") (citations omitted).

██

¶ 72. In essence, Pharmacia asks us to search the record for evidence to sustain an award that the jury could have, but did not reach, and this we cannot do. *K&S Tool & Die Corp.,* 301 Wis. 2d 109, ¶ 38. The jury was free to rely on the evidence it found most credible and equally free to discount evidence it did not. Both parties presented supporting material, and the jury made its decision. For the reasons set forth above, we conclude that the jury did not impermissibly speculate in arriving at its damage award with respect to brand name drugs.[18]

### 2. The Jury did not Impermissibly Speculate as to the Damage Award with Respect to Generic Drugs

██

¶ 73. As with brand drugs, the jury's award of damages with respect to generic drugs was based on credible evidence supporting the inference that the

---

[18] The parties debate the significance and relevance of various federal regulations, particularly requirements regarding the relationship between estimated and actual acquisition costs. Because it is not necessary to resolve this dispute in order to answer the speculativeness question, we do not address them.

publication of actual wholesale prices would have resulted in corresponding reductions to reimbursements. Specifically, Ted Collins ("Collins"), the consultant to DHS who established the reimbursement rates for generic drugs, testified that he was forced to rely on his own research in the market because he knew AWPs were substantially inflated. He further testified that he would have used actual wholesale prices to set reimbursement rates for generic drugs had he been given them. Thus, Collins' testimony provided a solid foundation from which the jury could have reasonably inferred that Medicaid would have used actual wholesale prices to reimburse generic drugs had Pharmacia supplied them. The same foundation therefore supported the reasonable inference that Medicaid was damaged by the inflated AWPs in the generic context in the same manner as it was damaged in the brand context: namely, that the difference between the inflated AWPs and actual average wholesale prices constituted the amount of the damage.[19] Accordingly, we conclude that the jury did not impermissibly speculate and therefore uphold the damage award.

¶ 74. Unlike brand name drugs, generic drugs are generally not reimbursed by Medicaid based on AWP.[20] Instead, they are reimbursed based on maximum allowable cost ("MAC"), an amount calculated to provide a uniform ceiling for generic drugs, given that they are often made available on the market at a wide range of prices. The purpose of a MAC is to reflect the price paid by a pharmacy to a wholesaler for a given drug.

---

[19] For this reason, Professor DeBrock's method of calculating damages, summarized above, was reasonably applied by the jury to both brand and generic drugs.

[20] According to Collins' testimony, generic drugs were occasionally reimbursed on the basis of AWP. For instance, there was

¶ 75. One witness in particular spoke to the damages issue with respect to generic drugs, and his unique insight and credible testimony provided a solid foundation for the jury's damage award.

¶ 76. Collins, a consultant to DHS, was responsible for setting the MACs for Wisconsin during the time relevant to this case. At trial, Collins recounted at length how he had struggled to obtain accurate pricing information for calculating MACs to set on generic drugs because he could not use the reported AWPs, which he knew to be substantially inflated and thus unreliable. In order to determine the MACs, Collins conducted independent research,[21] which often resulted in spotty and conflicting information. He compensated by adding money to the reimbursement rates to avoid erring on the side of excessive conservatism. As a result,

sometimes a "lag" period for a generic drug while it was on the market but before Collins was able to set a MAC. During such a period, Collins would set the reimbursement at the same rate as applied to brand drugs, e.g., the AWP of the drug minus 10%. However, because Collins' uncontroverted testimony established (and because the parties agree) that MACs were more central to the reimbursement process for generics than were AWPs, we focus our analysis in this section on the role MACs played in providing the basis for generic reimbursements, and the role AWPs *would have played* in that process had they reflected actual wholesale prices. To the extent that some generic drugs were at some times reimbursed on the basis of AWPs, damages assessed for those drugs at those times were not speculative for the same reasons set forth in the section discussing the damages imposed for Pharmacia's brand drugs, which were also reimbursed on the basis of AWP.

[21] For example, Collins testified that he researched the prices charged to veterinary hospitals for generic drugs purchased from wholesalers. He also consulted online information made available by a co-operative of pharmacists and records relating to drug purchases made by Wisconsin's prison system.

he testified, "[t]he poorer I was at guessing what the price should be, the more money" the state paid. He further stated under oath that if he had known the actual prices pharmacies paid wholesalers for generics, and if those prices had been lower than his MACs, he would have set the MACs consistent with such prices. Collins went so far as to claim that his job would have been rendered superfluous if companies like Pharmacia reported actual wholesale prices, remarking, "[i]f it was accurate information, [the state would] just apply it."

¶ 77. As with brand name drugs, Pharmacia sought to undermine the State's damages claim concerning generic drugs by offering evidence that various governmental officials had access to true pricing information and elected not to rely on it.[22] Their continuing reliance on that evidence fails for the same reason as it does with respect to brand name drugs. In a word, the jury reasonably rejected it. Indeed, its rejection is even more difficult to question in this context given the force of Collins' testimony. Regardless of what various other officials said to the jury, and regardless of what various governmental and industry documents contained, the jury heard a first-hand account of how the reporting of actual wholesale prices would have influenced Medicaid's reimbursement of generic drugs. Whatever other reasonable inferences the evidence might have occasioned, it surely must be said, at the very least, that "fair-minded" jurors could have drawn the "reasonable inference" that actual wholesale prices reported by Pharmacia would have reduced the amount paid by Medicaid for generic drugs. *Weber*, 191 Wis. 2d at 636. The jury selected "what

---

[22] For example, the jury received evidence that wholesalers themselves provided accurate pricing information and that the state had access to such information through FDB and other sources.

seem[ed] to them to be the most reasonable inference," *id.,* and we may not disturb that decision.

¶ 78. Finally, Pharmacia submits, as it has throughout these proceedings, that because generics were not reimbursed on the basis of AWPs, any damage award based on the inflation of AWPs with respect to generics must be speculative. Such an argument mischaracterizes the State's theory and the jury's verdict. The State did not argue at trial that Medicaid paid too much for generic drugs because it was incorporating inflated AWPs into its reimbursement process; rather, it argued that it paid too much for generic drugs because it *did not have actual wholesale prices* to use. Indeed, the State's theory regarding damages in the generic context was not substantively different in this respect than its theory in the brand name context. With brand drugs as well as generics, the State never contended that Medicaid paid Pharmacia the amounts Pharmacia supplied in its AWPs; it contended that Medicaid *estimated* what pharmacies paid to wholesalers because it knew the AWPs were inflated, but did not know by how much. Thus, in both contexts, the reporting of inflated AWPs harmed Medicaid, and in both the reporting of accurate AWPs would have saved Medicaid money. *See In re Pharm. Indus. AWP Litig.,* 582 F.3d 156, 190 (1st Cir. 2009) (affirming damages in AWP litigation as non-speculative where expert testimony established "that had the AWPs not been inflated, the plaintiffs would not have paid as much as they did"), *petition for cert. dismissed,* 561 U.S. __, 131 S. Ct. 60 (2010).[23]

_____

[23] *In re Pharmaceutical Industry AWP Litigation* dealt with a single brand name drug, but the simple proposition for which it is cited here—that damages are not speculative if accurate wholesale prices *would have* resulted in lower reimbursements —applies to generics as well.

¶ 79. Simply put, the proper calculation of damages focuses primarily on what *would have happened* absent the liable conduct, not what *did happen* with the liable conduct. *See, e.g., Schulz v. St. Mary's Hosp.*, 81 Wis. 2d 638, 657, 260 N.W.2d 783 (1978) (holding that a damage calculation is sound where the jury can "estimate with reasonable probability what would have happened had the injury not occurred"). Here, absent the liable conduct, Pharmacia would have reported actual wholesale prices, and the jury had credible evidence to support the inference that Medicaid would have reimbursed Pharmacia's generic drugs consistently with such accurate prices.

¶ 80. Lastly, and most importantly, the State supported its damage theory regarding generic drugs with credible evidence, most powerfully in the form of Collins' testimony that Medicaid would have used actual wholesale prices as the basis for its generic reimbursements if it had them. Far from constituting impermissible speculation, the jury's decision to rely on such testimony represented an exercise of the jury's traditional role in calculating damages. *See, e.g., Weber*, 191 Wis. 2d at 634–37 (collecting cases concerning the role of expert witnesses in helping to guide the jury in the calculation of damages based on likely future events). The jury chose to credit Collins' credible testimony, and we are not at liberty to unsettle that determination. *See Fischer*, 91 Wis. 2d at 92 ("The credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, and where more than one inference can be drawn from the evidence, this court must accept the inference drawn by the jury."); *Mgmt. Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 189, 557 N.W.2d 67 (1996)

(reiterating that a plaintiff need not "prove damages with mathematical precision; rather, evidence of damages is sufficient if it enables the jury to make a fair and reasonable approximation.") (citations omitted).

¶ 81. In sum, with respect to both generic and brand name drugs, Pharmacia sought to convince the jury that Medicaid knew it was paying pharmacies more than the pharmacies were themselves paying. It ably made that case at trial, placing its evidence in the most convincing light possible. Nevertheless, it lost the battle and the jury credited contrary evidence suggesting that the inflated AWPs injured the state by causing it to overpay for the drugs. That evidence also supported the reasonable inference that Wisconsin, if it had been equipped with actual wholesale prices for both brand name and generic drugs, would have paid Pharmacia in those amounts.[24] In such circumstances, we are not permitted to substitute our judgment for that of the jury, and we therefore uphold its damage award.

C. The Circuit Court Properly Reduced the Number of Violations Found by the Jury

¶ 82. The final question presented for our consideration is whether the circuit court properly reduced

---

[24] As it did at trial, Pharmacia stresses the political nature of the reimbursement process. Some of its language appears to suggest that it believes the politicization of the process, in and of itself, renders the damage award speculative. Pharmacia's claim that the proceedings below constituted an inappropriate invasion by the judicial branch into the exclusive province of the legislative and executive branches is pending in the court of appeals. It has not been certified, so we do not address it here. We answer only the certified question, which is whether or not the damages were impermissibly speculative. That inquiry does not require us to delve into the politicization of the process as a free-standing issue.

the number of Medicaid fraud statute violations found by the jury. We hold that it did, and therefore affirm.

## 1. Factual Background

¶ 83. At closing argument, the State argued to the jury that it should calculate the number of Medicaid fraud statute violations with reference to the number of times Medicaid overpaid as the result of an inflated AWP for a discrete drug product (brand or generic) purchased by a consumer. It submitted that 1,440,000 was the best estimate of that number. Pharmacia argued, consistent with its theory of the case, that Pharmacia never acted unlawfully, and sought to convince the jury that there were no violations and that the jury should answer this question "zero."

¶ 84. Question Four of the special verdict form completed by the jurors asked them whether Pharmacia "knowingly [made], or knowingly cause[d] to be made, any false statement or representation of material fact for use in determining rights to a Wisconsin Medicaid payment." Question Five asked, "[h]ow many such false statements or representations of material fact for use in determining rights to a Wisconsin Medicaid payment did Pharmacia Corporation knowingly make or cause to be made?" The jury instructions recited the elements of an offense of the Medicaid fraud statute,[25]

---

[25] The instructions informed the jury that a violation occurs where: 1) the defendant makes or causes to be made a representation of material fact for use in determining the rights to a payment requested by a Medicaid provider, i.e., a fact affecting the amount of payment; 2) the representation was false when made; 3) the defendant made the representation knowingly; and 4) the false statement was used in determining a provider's right to the payment requested by a Medicaid provider.

but gave no further guidance on how to determine the precise number of violations. After deliberating, the jury adopted the State's position and in a verdict rendered on February 16, 2009 found 1,440,000 violations.

¶ 85. In a post-trial brief, Pharmacia moved the circuit court to vacate the jury's calculation of violations and reduce the number to zero. The circuit court agreed with Pharmacia that the jury's finding was erroneous, because, as it stated in its order, it was based on a misleading argument by the State that shifted the "focus" from "the culpable conduct of the defendant" to the "*consequences* of the culpable conduct." (emphasis in original). In a decision dated May 15, 2009, the circuit court determined that "Pharmacia [was] subject to forfeiture for each false material statement or represen-tation it made or caused to be made, not each time someone looked at [the statement or representation], or even relied on it." Finding that the jury's determination was based on an erroneous legal premise, the circuit court vacated its answer. However, the circuit court rejected Pharmacia's contention that the proper num-ber of violations was zero, finding instead that there was "clearly evidence in [the] record that would support the imposition of forfeitures." Accordingly, the circuit court ordered further briefing and argument on the issue.

¶ 86. After that briefing and argument took place, the circuit court issued an order on September 30, 2009. In that order, the circuit court concluded that the jury had "completely missed the boat" as a result of the plaintiff's decision to "adopt[] an unsustainable theory of recovery" and go "all in" by "equating claims paid with misrepresentations made." The court then reduced the number of violations to 4,578. It derived that number by searching the record for the number of times that FDB conveyed to Medicaid (in its quarterly reports) a false

AWP for a Pharmacia product that Medicaid then used, at least once, in the reimbursement of a pharmacy. In other words, the circuit court found a violation "each time . . . updates were purchased by Wisconsin for each drug" and then used at least once by Medicaid in the reimbursement process. Weighing various factors related to the appropriate forfeiture amount per violation,[26] the circuit court imposed $1,000 for each violation, leading to a total forfeiture amount of $4,578,000.

### 2. The Circuit Court Resolved the Post-verdict Motion within 90 Days, as Required by Wis. Stat. § 805.16(3)

¶ 87. As a threshold matter, Pharmacia argues that the circuit court had no authority to reduce the number of violations because it did so more than 90 days after the jury rendered the verdict. In Pharmacia's opinion, the circuit court's order vacating the jury's determination concerning the number of violations was timely, but the ruling reducing the number of violations from 1,440,000 to 4,578 was in violation of Wis. Stat. § 805.16(3) and thus void. Because that ruling was void, Pharmacia reasons, the timely order vacating the jury's calculation of violations remains valid, and the number of violations is therefore frozen at zero. We disagree, and conclude that the circuit court acted within the timeline set by the statute.

---

[26] For example, the circuit court mentioned as aggravating factors that Pharmacia knowingly defrauded the state and that virtually all of the inflated AWPs resulted in multiple overpayments. It categorized as a mitigating factor the absence of evidence to suggest that the overpayments went "directly into Pharmacia's pockets."

¶ 88. Wisconsin Stat. § 805.16(3) states: "If within 90 days after the verdict is rendered the court does not decide a motion after verdict on the record or the judge . . . does not sign an order deciding the motion, the motion is considered denied and judgment shall be entered on the verdict." Pharmacia would have us apply that provision to the facts at hand to mean that "the trial court correctly vacated the answer to Question No. 5 within 90 days of verdict [but] then lost competence to provide a new answer." However, § 805.16(3) cannot sustain such a construction.

¶ 89. The circuit court did resolve the motion implicated by Wis. Stat. § 805.16(3) within 90 days; it did so by vacating the jury's calculation of violations. The further proceedings were not held to dispose of the motion; rather, those proceedings were required to answer the question left unresolved after the motion's disposition: how many violations of the Medicaid fraud statute did Pharmacia commit? That fact is sufficient to distinguish this case from *Brandner v. Allstate Ins. Co.*, 181 Wis. 2d 1058, 512 N.W.2d 753 (1994), one of the principal authorities relied upon by Pharmacia in the trial court. There, we deemed a "supplemental decision" a "nullity" because the circuit court issued it more than 90 days after the verdict. *Id.* at 1071. Crucially, however, there were no disputed issues in *Brandner* left unresolved by the earlier proceedings. Thus it presented a very different circumstance from this case, where the circuit court's original post-trial order itself indicated that further proceedings were necessary to determine an unresolved matter of great importance.[27]

---

[27] It is also worth noting that even though we regarded the supplemental decision in *Brandner* as void, we nevertheless upheld it under our discretionary powers because, among other

Consequently, a plain language reading of the statute leads us to conclude that it was not violated by the circuit court reducing the number of violations.

¶ 90. Furthermore, as we have previously observed, the purpose of the timeline established by Wis. Stat. § 805.16(3) is "to prevent *unnecessary* protraction of litigation." *Jos. P. Jansen Co. v. Milwaukee Area Dist. Bd. of Vocational, Technical & Adult Ed.*, 105 Wis. 2d 1, 9, 312 N.W.2d 813 (1981) (emphasis added) (internal quotation marks and citation omitted). Here, a thorough consideration of the issue can hardly be called unnecessary. On the contrary, the question of how many violations Pharmacia committed for forfeiture purposes was an enormously consequential one for both parties, as well as for the citizens of the state, the remaining defendants, and the pharmaceutical industry as a whole. Indeed, the difference between the jury's tally of violations and the circuit court's was well over one million, an amount that would be amplified considerably by the circuit court's award of a monetary amount for each violation. The circuit court acted properly and within the permitted timeframe in ensuring that such an important issue received the extensive briefing, argument, and deliberation that it deserved.

¶ 91. Finally, it would be absurd to leave the violation calculation at zero, where it would be if Pharmacia were right that the order vacating the jury's answer concerning the number of violations was timely but the subsequent order setting the number of violations at 4,578 was not. The circuit court vacated the jury's verdict with the express intention of *reducing* the number of violations to an amount supported by the

things, the earlier ruling "reflect[ed] [an] incorrect legal analysis." *Brandner v. Allstate Ins. Co.,* 181 Wis. 2d 1058, 1072, 512 N.W.2d 753 (1994).

record.[28] It would make no sense to read the statute as preserving the number of forfeitures at zero when the only reason they were vacated at all was to supply a reduced number. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted . . . to avoid absurd or unreasonable results."). As a result, we conclude that the court's ruling was not in violation of Wis. Stat. § 805.16(3).

### 3. There was Insufficient Evidence to Support the Number of Violations Found by the Jury and the Circuit Court Was Therefore Required to Vacate that Number

¶ 92. We now turn to the question of whether the circuit court properly vacated the number of violations found by the jury. To evaluate that decision, we must determine whether there was any credible evidence to support the jury's finding. *Hanson,* 294 Wis. 2d 149, ¶ 18. Because the number of violations found by the jury was unsupported by any evidence, we conclude that the circuit court acted properly.

¶ 93. The jury's calculation of violations was based on the State's theory that Pharmacia violated the Medicaid fraud statute every time the state overpaid for a drug on the basis of an inflated AWP. However, there is no authority to support that theory, which flies in the

[28] The circuit court noted that "[b]y striking the jury's answer . . . the court is not holding that the answer should be changed to '0.'" It added, "there is clearly evidence in this record that would support the imposition of forfeitures . . . . However, their number cannot be determined without . . . further argument from counsel."

face of the statute's plain language, as well as every judicial decision on the issue. *See, e.g., State v. Menard, Inc.,* 121 Wis. 2d 199, 358 N.W.2d 813 (Ct. App. 1984); *United States v. Bornstein,* 423 U.S. 303 (1976); *United States v. Ehrlich,* 643 F.2d 634 (9th Cir. 1981). Furthermore, there has never been any dispute that the jury's finding of 1,440,000 violations was based solely on the State's legal theory, which the jury adopted despite the fact that the court's instructions contradicted that theory. Because the jury's finding was based on an improper legal definition, there is no evidence to support it and the circuit court was required to vacate the number of violations.

¶ 94. As an initial matter, it is important to clarify whether the jury's error was one of law or fact. The circuit court was itself understandably confused on the issue, expressing uncertainty as to the proper source of authority for vacating the jury's answer.[29] The line here is a blurry one, for the jury's error falls near the gray area between law and fact. That is, the jury's finding of

---

[29] The circuit court was unsure whether the proceedings were properly governed by Wis. Stat. § 805.14(1)(error of fact) or by § 805.15(1)(error of law). Although it is somewhat ambiguous, the circuit court's June 18, 2009 ruling appears to fall more on the side of § 805.14(1). For instance, the circuit court stated that "the court here must enter judgment only based upon the number of statutory violations that the credible evidence, viewed in the light most favorable to the plaintiff within the context of the applicable law, can support." Such language suggests a § 805.14(1) inquiry into whether the jury committed an error of fact. *Morden v. Cont'l AG,* 2000 WI 51, ¶ 38, 235 Wis. 2d 325, 611 N.W.2d 659. For the reasons set forth below, we agree that the mistake is best characterized as one of fact, not law, and we therefore bring to bear the § 805.14(1) standard of review. Under that standard we will reverse the circuit court's ruling if there is any credible

1,440,000 violations flowed from a legal error but, as a result, it was unsupported by the evidence. Stated differently, the jury's finding can only be fairly understood as supported by the evidence if one adopts an erroneous legal theory.

¶ 95. Such complications might pose a more difficult question in another case, but they are resolved by a simple fact here: the jury was sufficiently instructed by the circuit court to have rejected the State's flawed legal theory. Ultimately, that fact resolves the standard of review. For there can be no error of law by the jury in the legal sense, in the context of a post-verdict motion, where a jury makes a challenged factual finding after accurate instructions from the court. Reduced to its essence, our system of law entrusts a trial court with instructing the jury on the law, and it entrusts the jury with applying the law to the facts. *See, e.g., Roehl Transp., Inc. v. Liberty Mut. Ins. Co.,* 2010 WI 49, 121–29, 325 Wis. 2d 56, 784 N.W.2d 542.

¶ 96. In this case, the jury was sufficiently instructed on the relevant law to understand that the State's theory of what constituted a violation was mistaken. They were told, in an instruction that tracked the language of the statute, that Pharmacia committed a violation whenever it made or caused to be made a misrepresentation. There is no logically defensible reading of that instruction that does not clearly contradict the State's theory. This is so because whatever legal significance one chooses to place upon the number of times Medicaid overpaid for Pharmacia

evidence, direct or inferential, to support the jury's finding. *Hanson v. Am. Family Mut. Ins. Co.,* 2006 WI 97, ¶ 18, 294 Wis. 2d 149, 716 N.W.2d 866.

drugs, that number cannot represent the number of times Pharmacia "made or caused to be made" any representations. By the time of overpayment, Pharmacia had already reported its AWP, and FDB had already published it to Medicaid. Any fraudulent "statements" had already been communicated and the alleged fraud was complete. The number of times pharmacies were overpaid is merely a consequence of the alleged fraud, not the fraudulent conduct itself. *Cf. People v. Pharmacia Corp.*, 27 Misc. 3d 368, 374 (N.Y. Sup. Ct. 2010) (holding that "each . . . *inflated price report* constitutes the accrual of a separate wrong" in AWP litigation) (emphasis added). Indeed, as a number that reflects the ramifications of the fraud to the injured party, the 1,440,000 violations goes to damages, if it goes to anything, not to forfeitures. *See, e.g., White v. Benkowski*, 37 Wis. 2d 285, 290, 155 N.W.2d 74 (1967)(noting that compensatory damages are awarded to make the injured party whole for the damage suffered while punitive damages, such as forfeitures, are given to punish the wrongdoer for malice and to deter others from similar conduct).

¶ 97. Case law confirms our plain language reading of the statute. Three decisions have shaped the debate in this case over what constitutes a violation. None of them supports the State's theory.

¶ 98. The only Wisconsin case among the three is *Menard*. There, the court of appeals held that a violation of a regulation prohibiting price-comparison advertising occurred each time an improper advertisement was published, and that each newspaper edition (as opposed to each newspaper containing the advertisement) constituted a separate publication. *Menard*, 121 Wis. 2d at 814. The court reasoned that this approach best reflected the defendant's culpable conduct, given

that each publication of the same advertisement in a different newspaper required an independent act. *Id.* at 815.

¶ 99. The United States Supreme Court dealt with a similar issue in *Bornstein,* a case involving shipments of falsely branded tubes for use in Army radios in violation of the False Claims Act. In that decision, the court held that a subcontractor was subject to three statutory forfeitures based on three separate shipments of the falsely branded tubes to the contractor. *Bornstein,* 423 U.S. at 313. Rejecting the argument that the number of forfeitures should reflect the number of false invoices the defendant "caused to be submitted," the *Bornstein* court concluded that a forfeiture analysis should be geared to "the specific conduct of the person from whom the Government seeks to collect the forfeiture." *Id.* Applying this reasoning, the court noted that the defendant did not deliberately cause the contractor to submit any particular number of false claims. *Id.* at 322. Instead, the number of false claims was "completely fortuitous and beyond [the defendant's] knowledge or control." *Id.*

¶ 100. The third and final decision that has shaped the forfeiture debate in this case is that of the Ninth Circuit Court of Appeals in *Ehrlich,* another case concerning the False Claims Act. In *Ehrlich,* the Ninth Circuit held that a builder was subject to 76 forfeitures relating to each false monthly statement he made to the government. 643 F.2d at 638. Applying the reasoning of *Bornstein* while distinguishing its fact pattern, the *Ehrlich* court held that "if a person knowingly causes a specific number of false claims to be filed, he is liable for an equal number of forfeitures." *Id.*

¶ 101. There is no colorable argument, under either the statute or the cases, that Pharmacia commit-

ted a violation every time Medicaid overpaid for a drug. As noted, that event is not a statement—by Pharmacia, by FDB, or by anyone else—and it therefore fails to satisfy the plain language of the statute. Moreover, the payment occurs after the completion of the alleged fraud, and so it does not reflect "the specific conduct of the" defendant, *Bornstein,* 423 U.S. at 313, and it consequently does not form the basis for a forfeiture award.

██ ██

¶ 102. The jury did not require this exposition of case law in order to be able to discount the legal theory presented by the State. Equipped with instructions from the circuit court that a violation occurred every time Pharmacia made or caused to be made a misrepresentation, the jury was in a position to understand that the number of times Medicaid overpaid for Pharmacia drugs was not the number of times Pharmacia violated the Medicaid fraud statute. For whatever reason, the jury failed to apply that instruction. Nonetheless, the fact that its misunderstanding stemmed from the State's flawed legal theory does not operate to transform the appropriate legal analysis performed by either the circuit court or this court from a mistake of fact inquiry to a mistake of law inquiry. As the jury was accurately informed, it is the court's role to instruct the jury on the law, not the attorneys'. *Mullen v. Reinig,* 72 Wis. 388, 392–93, 39 N.W. 861 (1888). The circuit court was required, and so too are we, to presume that the jury followed this instruction and all others. *State v. LaCount,* 2008 WI 59, ¶ 23, 310 Wis. 2d 85, 750 N.W.2d 780; *cf. Ex parte Par Pharm., Inc.,* 58 So. 3d 767, 781 (Ala. 2010) (holding that there is "no reason why [a] trial court through careful management will not be able

570

to avoid or minimize any prejudice or confusion that might result" from a jury's attempt to understand complex AWP litigation).

¶ 103. Thus, once the circuit court properly instructed the jury on the law and the jury applied that law to find 1,440,000 violations, the circuit court had no choice but to review the record for evidence supporting that finding. In so doing, it was not required to look at the evidence through the lens of a legal theory that it knew was incorrect. On the contrary, it—and we—are required to presume the jury obeyed the instructions as given, *LaCount,* 310 Wis. 2d 85, ¶ 23, and the circuit court therefore properly reviewed the evidence in the context of those instructions. *Kovalic v. DEC Int'l, Inc.,* 161 Wis. 2d 863, 873 n.7, 469 N.W.2d 224 (Ct. App. 1991). Ultimately, it is of no legal consequence that the jury's erroneous factual finding was based on an erroneous legal theory, because that theory was submitted by a party and thus did not bind the jury. *Mullen,* 72 Wis. at 392–93. For purposes of ascertaining whether the error was factual or legal, the dispositive fact is that the jury was properly instructed.

¶ 104. Applying the standard for factually erroneous jury verdicts, we have no doubt that the circuit court correctly vacated the number of violations. This is so because there was simply no evidence to directly or inferentially support the proposition that the number of times Medicaid overpaid for drugs represented the number of times Pharmacia violated the Medicaid fraud statute. For the reasons set forth above, there is evidence to support the finding of 1,440,000 violations only if one assumes the veracity of the State's legal theory. Because that legal theory is mistaken, there is no evidence to support the jury's finding and the circuit court was empowered to vacate the finding.

571

### 4. The Circuit Court Properly Reduced the Number of Violations to 4,578

¶ 105. Having determined that the circuit court was required to reduce the number of violations, the question remains as to whether it reduced the number in the correct amount. To answer that question, we must consider whether the record reveals that the number of violations found by the circuit court was "clearly wrong."[30] *Richards,* 200 Wis. 2d at 671–72. We hold that it was not, and therefore affirm the circuit court's ruling.

¶ 106. Four approaches have been suggested for calculating the number of violations. We have already rejected one—the State's theory that Pharmacia committed a violation every time Medicaid overpaid for a drug —and declined to address another.[31] The remaining

---

[30] The "clearly wrong" language cited in this section, and the "any credible evidence" language cited in the section above regarding whether the circuit court properly vacated the jury's answer are actually different iterations of the same standard. That is, "[a] circuit court's decision to change the jury's answer is 'clearly wrong' *if* the jury verdict is supported by 'any credible evidence.' " *Best Price Plumbing, Inc. v. Erie Ins. Exch.,* 2012 WI 44, ¶ 30, 340 Wis. 2d 307, 814 N.W.2d 419 (emphasis added) (citation omitted). Here, because the jury determined the original number of violations, while the circuit court determined the final number, it makes most sense in the context of this case to employ the "any credible evidence" language in our analysis of the circuit court's decision to vacate the jury's answer, and the "clearly wrong" language in our analysis of the circuit court's determination of the actual number of violations.

[31] The question of whether Pharmacia committed no violations is a question that goes to the question of liability; that question has not been certified and we therefore do not address it.

alternatives are: 1) a violation occurred every time Pharmacia reported an inflated AWP (i.e., every time it transmitted an inflated AWP to FDB which was then conveyed to Medicaid), or 2) a violation occurred every time FDB transmitted an inflated AWP to Medicaid and Medicaid then relied on it at least once in the reimbursement of a pharmacy. The circuit court chose the latter approach, and we agree that it was the appropriate one.

¶ 107. Beginning with the plain language of the statute, *Kalal,* 271 Wis. 2d 633, ¶ 49, the circuit court's calculation of violations is consistent with the words chosen by the legislature. Wisconsin Stat. § 49.49(4m)(a)2. provides that "[n]o person, in connection with medical assistance, may . . . [k]nowingly make or cause to be made any false statement or representation of material fact for use in determining rights to a benefit or payment." By including the phrase, "cause to be made," the legislature made clear that a defendant commits a violation when a third party transgresses the statute in a manner that was caused by the defendant. That is precisely what occurred in this case. Pharmacia reported its AWPs to FDB so that FDB would in turn convey them to Medicaid. It therefore knowingly caused those statements to be made, and the circuit court properly followed the language of the statute.

■■

¶ 108. Case law bolsters our statutory interpretation. Viewing the cases in this area of law as a whole, we draw the following lesson. Where a defendant perpetrates a fraud, the completion of which requires a third party to act in furtherance of that fraud in a manner reasonably foreseeable to the defendant, the calculation of violations should include such actions by the third party. *See Menard,* 121 Wis. 2d 199; *Bornstein,* 423 U.S.

303; *Ehrlich,* 643 F.2d 634. Indeed, it would be irrational for a forfeiture award to be based on a small number of fraudulent actions by a defendant, when the defendant acts with the knowledge and purpose that a third party will complete the fraud and hugely amplify the consequences of those actions, and when the defendant then benefits greatly from the third party's conduct.

¶ 109. Applying these principles, we conclude that the circuit court's calculation of violations properly included the number of times FDB transmitted an inflated AWP for a Pharmacia product to Medicaid, and Medicaid then relied upon it at least once in the reimbursement process. This is so because Pharmacia's purpose in reporting AWPs to FDB was for the ultimate use of state Medicaid agencies. While Pharmacia may not have known the precise number of times Medicaid would then access the information (because that number was a function of Medicaid's arrangement with FDB), it knew that its AWPs would only reach Medicaid via FDB. Furthermore, the fraud that the jury found Pharmacia liable for committing could not have been realized until the inflated AWPs reached Medicaid through FDB; for until that happened, the inflated AWPs could not have played any role in the calculation of reimbursements, where the injury occurred. Unlike the number of times Medicaid overpaid for drugs, which took place after the fraud occurred, FDB's transmittal of the inflated AWPs was an integral component of the fraud. We therefore conclude that the number of times FDB transmitted to Medicaid an inflated AWP provided by Pharmacia and used at least once by the state in the Medicaid reimbursement process constituted the best measure of how many violations occurred. Accordingly,

the circuit court properly reduced the jury's calculation of violations to 4,578, and we affirm its order.

## V. CONCLUSION

¶ 110. The court of appeals certified three questions to this court: 1) whether the State was entitled to a jury trial; 2) whether the damages were based on impermissible speculation by the jury; and 3) whether the circuit court properly reduced the number of violations. Because each of these issues was correctly resolved in the circuit court, we affirm. We remand the cause to the court of appeals to resolve the remaining issues. *See DeChant v. Monarch Life Ins. Co.,* 200 Wis. 2d 559, 595 n.2, 547 N.W.2d 592 (1996) (remanding a case to the court of appeals to resolve remaining issues after limiting review to certified questions).

*By the Court.*—The orders of the circuit court are affirmed and the cause is remanded to the court of appeals.

¶ 111. ANN WALSH BRADLEY, N. PATRICK CROOKS, and DAVID T. PROSSER, J.J., did not participate.